ORSUS GATE LLP
Denis Shmidt (Bar No. 267987)
Nabil Bisharat (Bar No. 270305)
Patricia Rojas-Castro (Bar No. 339087)
16 N. Marengo Ave., Suite 505
Pasadena, CA 91101
Telephone: (415) 326-3558
Email: DShmidt@OrsusGate.com
Email: NBisharat@OrsusGate.com
Email: PRojas@OrsusGate.com

*Attorneys for Plaintiff Dhrumil Purohit*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DHRUMIL PUROHIT, an individual, <br><br> Plaintiff, <br><br> v. <br><br> MARK HYMAN, an individual; HYMAN DIGITAL, LLC, a Massachusetts limited liability company, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT;** <br> **(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **(3) FRAUD;** <br> **(4) UNJUST ENRICHMENT / RESTITUTION; AND** <br> **(5) FRAUDULENT FILING OF INFORMATION RETURN (26 U.S.C.A. § 7434).** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Dhrumil "Dhru" Purohit ("Plaintiff" or "Mr. Purohit"), for his complaint against Defendants Hyman Digital, LLC ("HD") and Mark Hyman ("Dr. Hyman"; together with HD, the "Defendants"), alleges as follows:

## INTRODUCTION

1. Mr. Purohit and Dr. Hyman first met through mutual friends in 2009.

2. After years of discussing a business relationship, the two began working together in 2015 when Mr. Purohit joined Dr. Hyman as HD's Chief Executive Officer ("CEO") and minority member.

3. In 2019, the two founded Farmacy, LLC ("Farmacy"), with each owning 50% and with Mr. Purohit serving as Farmacy's managing member.

4. In 2023, the Parties' relationship fell apart when Mr. Purohit resigned as HD's CEO and Dr. Hyman refused to pay Mr. Purohit his contractually required buyout.

5. After months of negotiations proved futile, Mr. Purohit was forced to initiate litigation in Massachusetts and arbitration in California.

6. Dr. Hyman very quickly experienced a "change of heart," and the Parties entered into a settlement agreement under which Mr. Purohit received $2,421,052 in exchange for his equity in HD, and Dr. Hyman received $750,000 for his equity in Farmacy.

7. The sale or exchange of an interest in a business entity (such as HD or Farmacy) is typically taxable as a long-term capital gain at reduced tax rates (assuming the interests have been held for at least a year). Additionally, the purchase price for a capital asset is typically non-deductible to the payor at the time of payment.

8. Mr. Purohit then dismissed both the Massachusetts litigation and the California arbitration, following the settlement agreement.

9. After receiving the dismissals he wanted, in April 2025, Dr. Hyman and HD filed and served Mr. Purohit with the following three 2024 Internal

Revenue Service ("IRS") Forms: (1) a form 1099-B Form from HD to Mr. Purohit identifying $318,410 in proceeds for Mr. Purohit's shares in HD, (2) a 1099-MISC Form from HD to Mr. Purohit identifying $1,352,642 in "other income", and (3) a 1099-MISC Form from Dr. Hyman to Mr. Purohit identifying $3,000,000 in "other income" (the "Fraudulent 1099s").

10. The various IRS 1099 Forms are generally used to report to both the IRS and the recipient of a payment or transfer the amount that is taxable to the recipient. In practice, many of these forms, including Form 1099-MISC, are used to notify the recipient that the issuer intends to deduct the amount as a business expense. If the payment recipient reports the payment as anything other than ordinary income or reports a different amount than reported on the IRS Form 1099, there is a heightened risk of IRS and/or state tax audit and assessment of additional taxes due to incongruent tax treatment by the parties. Even if resolved in the recipient's favor, an audit results in unnecessary time and expense working with federal and state tax authorities.

11. Contrary to the settlement agreement, the Fraudulent 1099s improperly imply that a majority of the payments to Mr. Purohit are deductible to one or both of Defendants and reportable as ordinary income to Mr. Purohit—as opposed to capital gains—and include an alleged $3 million payment from Dr. Hyman to Mr. Purohit that was never paid or even contemplated.

12. The Fraudulent 1099s increase the chances of Mr. Purohit being audited and assessed with additional taxes that do not reflect the true nature and value of settlement agreement transactions. Specifically, the Fraudulent 1099s recharacterize capital gain transactions as ordinary business transactions generating a deduction for Defendants and ordinary income for Mr. Purohit. Additionally, the Fraudulent 1099s grossly misstate the value Mr. Purohit received for his HD interest, requiring him to either inflate his income on his tax return or risk IRS audit for not reporting the full amount from the 1099s.

13. After months of additional negotiations, Defendants amended the Form 1099-B to reflect $0 for Mr. Purohit's shares in HD but have refused to withdraw or amend the two 1099-MISC forms.

14. These forms must be withdrawn or amended, and Mr. Purohit is entitled to damages for the harm these Fraudulent 1099s have caused him, including a potential IRS audit, CPA costs, counsel costs, and his own time.

15. Furthermore, Defendants' actions clearly indicate that they never intended to abide by the settlement agreement, only pretending to agree to the terms in order to fraudulently induce Mr. Purohit to sign the settlement agreement and dismiss his claims. All the while, Defendants intended to file the Fraudulent 1099s.

## THE PARTIES

16. Plaintiff Dhrumil "Dhru" Purohit is a California citizen residing within Los Angeles County in California.

17. Defendant Mark Hyman is a Massachusetts citizen residing within Berkshire County in Massachusetts. On information and belief, he is the sole member of HD.

18. Defendant Hyman Digital, LLC is a Massachusetts limited liability company with its principal place of business at 55 Pittsfield Road, Lennox Commons, Suite 9, Lenox, Massachusetts 01240.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over Plaintiff's federal fraudulent filing of information returns claim (26 U.S.C.A § 7434) pursuant to 28 U.S.C.A. § 1331.

20. This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C.A. § 1367.

21. This Court also has diversity jurisdiction pursuant to 28 U.S.C.A. §1332 (a). The diversity of citizenship prong is met as follows:

    a. Plaintiff is a California citizen residing within Los Angeles County in California.

    b. Defendant Dr. Hyman is a Massachusetts citizen residing within Berkshire County in Massachusetts.

    c. Defendant HD is a Massachusetts limited liability company whose sole member is a Massachusetts citizen.

22. The amount in controversy exceeds $75,000.

23. Venue is proper because the Parties agreed to submit to the jurisdiction of this Court to adjudicate disputes arising out of or related to the Parties' settlement agreement. [*See* Exhibit A (Settlement Agreement) ¶ 27].

24. Venue is also proper pursuant to 28 U.S.C.A. §§ 1391(b) and 1391(c) because Plaintiff resides in this judicial district, and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS[1]

### A. The Parties' Business Relationship

25. Between 2015 and 2023, Mr. Purohit's was employed as HD's CEO and was also its minority member.

26. Farmacy was founded in November 2019, with both Mr. Purohit and Dr. Hyman as its only two members, but with Mr. Purohit as Farmacy's sole Manager. Each owned a 50% equity stake.

27. Despite years of success and friendship, the relationship between the two men reached an impasse in 2023 after Mr. Purohit decided to move on from HD.

---

[1] A more complete background of the Parties' relationship can be found in the Massachusetts Lawsuit and the Farmacy Arbitration. [*See* Exhibits D-E].

4

COMPLAINT AND DEMAND FOR JURY TRIAL

28. Pursuant to an agreement between the parties, upon his resignation as HD's CEO, HD was required to purchase Mr. Purohit's equity interest based on a specific formula (the "HD Buyout").

29. While initially amicable, Dr. Hyman and HD refused to honor their contractual obligations to Mr. Purohit.

**B.  The Parties' Negotiations, Litigation, and Arbitration**

30. Although the exact amount was somewhat disputed, both Mr. Purohit and Dr. Hyman generally agreed that the HD Buyout was approximately $2.4 million.

31. Using this formula, in February and March 2024, the Parties generally agreed to a framework where Dr. Hyman would buyout Mr. Purohit's ownership interest in HD for roughly $2.4 million and Mr. Purohit's ownership interest in Farmacy for an additional $552,500.

32. The parties then spent the next five months negotiating a final agreement.  A true and correct copy of the Settlement Agreement and of the parties' communications are attached hereto as **Exhibit A** and as **Exhibit B**, respectively.

33. On July 8, 2024, when negotiations appeared to have stalled, Mr. Purohit sent Defendants a settlement agreement (the "July 8 Version") and provided an ultimatum requiring that Dr. Hyman either accept the July 8 Version or that Mr. Purohit would initiate litigation.  A true and correct copy of the July 8 Version is attached hereto as **Exhibit C**.

34. Consistent with the Parties' prior agreement, the July 8 Version again allocated approximately $2.4 million to Dr. Hyman's acquisition of HD and $552,500 to Dr. Hyman's acquisition of Farmacy.

35. Dr. Hyman refused and, on July 11, 2024, Mr. Purohit filed a lawsuit against Dr. Hyman and HD in United State District Court for the District of

Massachusetts (Case No. 1:24-cv-11784) (the "Massachusetts Lawsuit"). A true and correct copy of the Massachusetts Lawsuit is attached hereto as **Exhibit D**.

36. Due to the harm that Dr. Hyman caused Farmacy during the Parties' negotiations, on August 15, 2024, Mr. Purohit also initiated arbitration in California (the "Farmacy Arbitration"). A true and correct copy of the Farmacy Arbitration is attached as **Exhibit E**.

**C.   Dr. Hyman's Capitulation and Settlement**

37. On August 24, 2024, Dr. Hyman, through counsel, expressed that he wanted to settle on the same terms as outlined in the July 8 Version. However, by August, facts had changed, and Mr. Purohit had already put in too much time and effort into rehabilitating Farmacy.

38. On August 27, 2024, Mr. Purohit transmitted an updated settlement agreement (the "August 27 Version") in which Dr. Hyman still bought HD for approximately $2.4 million but Mr. Purohit bought Dr. Hyman's interest in Farmacy for the amount in Farmacy's TD Bank account (which at the time amounted to approximately $424,000). A true and correct copy of the August 27 Version is attached hereto as **Exhibit F**.

39. On August 28, 2024, Dr. Hyman's counsel responded with an updated draft (the "Hyman August 28 Version"). In this version, Dr. Hyman and HD offered to pay the $2.4 million for HD over three years or $2.1 million in one lump sum. As for Farmacy, they proposed that Mr. Purohit buyout Dr. Hyman's share of Farmacy for $1 million. A true and correct copy of the Hyman August 28 Version is attached hereto as **Exhibit G**.

40. Later that day, Mr. Purohit's counsel reverted an updated version of the settlement agreement (the "Purohit August 28 Version"). In this version, the amount Dr. Hyman and HD would need to pay to Mr. Purohit was reduced from $2,421,052 to $1,671,052 and the proposed $1 million payment to Dr. Hyman for Farmacy was eliminated. The intention was to make the payments cleaner and to

account for the amount Dr. Hyman would otherwise receive for his interest in Farmacy. To make this intention crystal clear, Mr. Purohit's counsel included the following note within the Purohit August 28 Version: "To make the payments cleaner, we have discounted $750,000 off of the HD Settlement Amount to account for the amount [Dr. Hyman] would otherwise receive for his Farmacy shares." A true and correct copy of the Purohit August 28 Version is attached hereto as **Exhibit H**.

41. On August 29, Dr. Hyman's team sent an updated draft where they attempted to, once again, claim a $1 million reduction for Dr. Hyman's share of Farmacy (the "Hyman August 29 Version"). A true and correct copy of the Hyman August 29 Version is attached hereto as **Exhibit I**.

42. Later that day, Mr. Purohit's counsel sent an updated draft (the "Purohit August 29 Version"), denying Dr. Hyman's edits with the following explanation: "Reverted back to previous version. We are not willing to claim that the other amount came from Farmacy as that is not the deal we presented and would only create improper tax consequences." A true and correct copy of the Purohit August 29 Version of the Settlement Agreement is attached hereto as **Exhibit J**.

43. Over the next day, the Parties made edits to other portions of the agreement, but ultimately the language related to the buyout amounts remained in place, resulting in a Settlement Agreement where Defendants paid Mr. Purohit the sum of $1,671,052 in exchange for Mr. Purohit's ownership interest in HD, and which included a $750,000 discount for Dr. Hyman's ownership interest in Farmacy.

44. The Settlement Agreement was entered into on or about August 30, 2024. [*See* Exhibit A].

45. Although not expressly stated within the Settlement Agreement, based on the Parties' extensive settlement discussions, all documented in writing, the

settlement resulted in Mr. Purohit receiving $2,421,052 in exchange for his equity in HD and Dr. Hyman receiving $750,000 for his equity in Farmacy.

46. As a result, Mr. Purohit became the sole owner and member of Farmacy and Dr. Hyman became the sole owner and member of HD.

47. Pursuant to the Settlement Agreement, Mr. Purohit dismissed the Massachusetts Lawsuit and Farmacy Arbitration.

**D.  The Erroneous Tax Filings**

48. In April 2025, Dr. Hyman and HD filed and issued the Fraudulent 1099s. True and correct copies of the Fraudulent 1099s are attached hereto as **Exhibit K**, **Exhibit L**, and **Exhibit M**, respectively.

49. All three forms inaccurately describe the nature and value of the transactions under the Settlement Agreement and are an improper attempt by Defendants to mislead the IRS and state tax authorities and (1) force Mr. Purohit to inflate his income tax liability and (2) obtain a tax advantage for the Defendants that was not contemplated in the settlement agreement by recategorizing capital asset transactions as ordinary business transactions.

50. Based on the Settlement Agreement and the underlying facts related to the disputes, the origin of the claim upon which the Settlement Agreement is based is entirely rooted in the sale/exchange of capital assets in the form of transfers of interests in HD and Farmacy, and with respect to Mr. Purohit's interest in HD, a cash payment for the same.

51. Further, Defendants have no legal requirement to file IRS Forms 1099 and have filed the Fraudulent 1099s to (1) harass Mr. Purohit and (2) improperly shift tax liability from Defendants to Mr. Purohit.

52. For example, Defendants initially issued an erroneous IRS Form 1099-B, even though that form is only required for "Broker and Barter Exchange Transactions." On information and belief, neither Defendant is a broker, nor does either operate any barter exchange. Further, a broker or barter exchange would only

file an IRS Form 1099-B for transactions that they brokered or bartered. The Settlement Agreement was not brokered by any party, nor was it handled through any barter exchange. Accordingly, IRS Form 1099-B is not an appropriate filing for these transactions.

53. IRS Form 1099-MISC, on the other hand, is required for various types of payments made in the ordinary course of business. IRS Form 1099-MISC is generally used for payments or transfers that are deductible to the issuer and taxed as ordinary income to the recipient and are not typically used to report transactions involving the sale or exchange of a capital asset. In this case, the amounts entered in box 3 of the IRS Form 1099-MISC for "other income payments". However, because the Settlement Payment and Farmacy interest were not transferred "in the course" of Defendants' business, the issuance of the two IRS Forms 1099-MISC was also improper.

54. The 1099-MISC form issued from Dr. Hyman to Mr. Purohit claiming that Dr. Hyman paid Mr. Purohit $3 million in ordinary income, is particularly egregious because there is absolutely no basis for Dr. Hyman to argue that he paid Mr. Purohit $3 million at all, let alone in ordinary income. If anything, Mr. Purohit is the one who paid Dr. Hyman $750,000 for Dr. Hyman's equity in Farmacy—which Mr. Purohit intends to properly report to the IRS.

55. Because the transactions where Dr. Hyman received $750,000 in value for his equity in Farmacy are non-deductible to Dr. Hyman, there is absolutely no benefit to Dr. Hyman inflating the value of Farmacy other than to harass Mr. Purohit.

**E.   Mr. Purohit's Ongoing Damages**

56. Between April and June 2025, Mr. Purohit was forced to retain CPAs, litigation counsel, and tax counsel to analyze and respond to Defendants' Fraudulent 1099s.

57. After months of discussions with Defendants' counsel, in June 2025, HD issued a corrected IRS Form 1099-B, correctly replacing the $318,410 with $0. A true and correct copy of the amended Form 1099-B is attached as **Exhibit N.**

58. However, Defendants have categorically refused to withdraw or correct their erroneously filed IRS Form 1099-MISCs and have threatened to issue a third 1099-MISC, once again falsely claiming that Mr. Purohit received $318,410 from HD in exchange for his equity in HD.

59. Once Mr. Purohit files the *correct* documents with the IRS, the IRS will be faced with two drastically different filings based on the same underlying transaction. This will undoubtedly result in an IRS Audit—which Mr. Purohit will need to spend considerable resources to facilitate, including his own time, his staff's time, attorney time, and CPA time. In total, Mr. Purohit's damages are well in excess of $750,000, and continue to increase.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Contract

60. Mr. Purohit incorporates all of his preceding allegations.

61. On or around August 30, 2024, Mr. Purohit and Defendants entered into a Settlement Agreement.

62. Mr. Purohit performed all his duties and services required under the Settlement Agreement, including dismissing the Massachusetts Lawsuit and Farmacy Arbitration.

63. Dr. Hyman and HD breached the Settlement Agreement by inaccurately reporting the result of the effect of the Settlement Agreement to the IRS through the filing of the Fraudulent 1099s.

64. Because of Defendants' breach, Mr. Purohit has sustained damages in an amount to be determined at trial, but not less than $750,001, plus interest, costs, and attorneys' fees.

65. Mr. Purohit is further entitled to injunctive or declaratory relief requiring that Defendants correct the Fraudulent 1099s by amending all forms to reflect a $0 value in all boxes, or withdrawing the 1099s in their entirety, and not issuing any further IRS forms to Mr. Purohit related to the Settlement Agreement.

## SECOND CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

66. Mr. Purohit incorporates all of his preceding allegations.

67. Implied in every contract is the obligation to act in good faith and fairly.

68. The Settlement Agreement constitutes a valid and enforceable written contract between Mr. Purohit and Defendants.

69. Mr. Purohit has at all times performed all duties, obligations, and covenants required of him under the Settlement Agreement, other than those obligations from which he is legally excused.

70. Dr. Hyman and HD unfairly interfered with Mr. Purohit's right to receive the benefits of the Settlement Agreement and undermined the purpose of the Settlement Agreement by willfully filing the Fraudulent 1099s.

71. As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Mr. Purohit was harmed and has sustained damages in an amount to be determined at trial, but not less than $750,001, plus interest, costs, and attorneys' fees.

72. Mr. Purohit is further entitled to injunctive or declaratory relief requiring that Defendants correct the Fraudulent 1099s by amending all forms to reflect a $0 value in all boxes, or withdrawing the 1099s in their entirety, and not issuing any further IRS forms to Mr. Purohit related to the Settlement Agreement.

## THIRD CAUSE OF ACTION

### Intentional Misrepresentation (Fraud)

73. Mr. Purohit incorporates all of his preceding allegations.

74. On August 30, 2024, Mr. Purohit and Defendants entered into the Settlement Agreement.

75. The Settlement Agreement was preceded by over twenty drafts over the span of nearly a year.

76. During the negotiations, Defendants repeatedly attempted to modify these terms in order to be able to claim that their payment to Mr. Purohit could be categorized as regular income and not capital gains.

77. Mr. Purohit repeatedly refused these attempts and Defendants seemingly agreed.

78. The negotiations resulted in the Settlement Agreement, wherein Mr. Purohit received $2,421,052 in exchange for his equity in HD and Dr. Hyman received $750,000 for his equity in Farmacy.

79. Both payments were intended to be taxed as capital gains, not regular income.

80. Once Defendants received the benefit of the Settlement Agreement—the dismissal of the Massachusetts Lawsuit and the Farmacy Arbitration and clean ownership over HD—their true intentions came to light.

81. Rather than abiding by their agreement, Defendants issued the Fraudulent 1099s, falsely claiming that Mr. Purohit received *millions* of dollars in regular income, including $3 million that he ostensibly received for Farmacy.

82. Based on Defendants' conduct, it has become clear that they never intended to abandon their position but merely pretended to do so to induce Mr. Purohit into executing the Settlement Agreement.

83. Mr. Purohit justifiably relied on Defendants' representations, including dismissing the Massachusetts Lawsuit and Farmacy Arbitration, because Dr. Hyman and HD appeared to be acting consistently with the Settlement Agreement.

84. In committing this wrongful act, Defendants acted intentionally, with malice and in conscious disregard of Mr. Purohit's rights and resulting damages.

85. As a result of Dr. Hyman and HD's actions, Mr. Purohit has sustained damages in an amount to be determined at trial.

86. Mr. Purohit is further entitled to an award of punitive and exemplary damages.

87. Mr. Purohit is further entitled to injunctive or declaratory relief requiring that Defendants correct the Fraudulent 1099s by amending all forms to reflect a $0 value in all boxes, or withdrawing the 1099s in their entirety, and not issuing any further IRS forms to Mr. Purohit related to the Settlement Agreement.

## FOURTH CAUSE OF ACTION

## Unjust Enrichment / Restitution

88. Mr. Purohit incorporates all of his preceding allegations.

89. In the alternative to the breach of contract claims, Mr. Purohit asserts a claim for relief for unjust enrichment and restitution.

90. Mr. Purohit performed all his duties and services required under the Settlement Agreement, including dismissing the Massachusetts Lawsuit and Farmacy Arbitration.

91. Meanwhile, Defendants filed the Fraudulent 1099s.

92. Based on the Fraudulent 1099s, Defendants seek to deduct millions of dollars in what they would otherwise owe to the IRS while simultaneously saddling Mr. Purohit with additional and improper tax burdens.

93. Due to their wrongful acts, Defendants have been unjustly enriched at Mr. Purohit's expense.

94. Mr. Purohit now seeks restitution from Defendants and seeks an order disgorging all profits, benefits, and other compensation obtained by Defendants in an amount to be determined at trial.

95. Mr. Purohit is further entitled to injunctive or declaratory relief requiring that Defendants correct the Fraudulent 1099s by amending all forms to reflect a $0 value in all boxes, or withdrawing the 1099s in their entirety, and not issuing any further IRS forms to Mr. Purohit related to the Settlement Agreement.

## FIFTH CAUSE OF ACTION

## Fraudulent Filing of Information Returns (26 U.S.C.A. § 7434)

96. Mr. Purohit incorporates all of his preceding allegations.

97. In April 2025, Defendants issued the Fraudulent 1099s.

98. The Fraudulent 1099s were issued despite the Parties' agreements that the money paid in the Settlement Agreement was in exchange for Mr. Purohit's interest in HD and Dr. Hyman's interest in Farmacy.

99. The 1099s were both willful and fraudulent because Defendants attempted to convince Mr. Purohit to categories these transactions as regular income during the negotiations and, when that failed, pretended to agree to Mr. Purohit's terms to induce him into signing the Settlement Agreement and dismissing the Massachusetts Lawsuit and Farmacy Arbitration.

100. Once Defendants received the benefits from the Settlement Agreement, they unilaterally filed the Fraudulent 1099s claiming exactly what was denied to them through negotiation.

101. Despite months of discussions between counsel, Defendants have refused to withdraw or amend two of the three Fraudulent 1099s and continue to threaten to file an additional fraudulent 1099.

102. As a result of Defendants' actions, Mr. Purohit seeks either statutory damages or actual economic damages, whichever are greater.

103. Mr. Purohit further seeks statutory costs, interest, and attorneys' fees.

104. Pursuant to 26 U.S.C.A. § 7434 (d), Mr. Purohit will provide a copy of this Complaint to the IRS upon its filing.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment and relief against Defendants as follows:

1. Monetary damages in an amount to be determined at trial, but not less than $750,001.00;

2. An order disgorging all profits, benefits, or other compensation obtained by Dr. Hyman and HD from their wrongful conduct and restitution of those profits to Mr. Purohit;

3. Preliminary and permanent injunction requiring that Defendants correct the Fraudulent 1099s by amending all forms to reflect a $0 value in all boxes, or withdraw the 1099s in their entirety, and an order forbidding Defendants from issuing any further IRS forms to Mr. Purohit related to the Settlement Agreement;

4. Punitive and exemplary damages to be determined at trial;

5. An order awarding Mr. Purohit costs of suit;

6. Pre- and post-judgment interest, as required by contract or law, whichever is greater;

7. Attorneys' fees, as authorized by contract, statute, or law, whichever is greater; and

8. Such other relief as the Court may deem just and proper.

Dated: July 14, 2025                    Respectfully Submitted,

ORSUS GATE LLP
  Denis Shmidt
  Nabil Bisharat
  Patricia Rojas-Castro


By: /s/ Shmidt
  Denis Shmidt
  *Attorneys for Plaintiff*
  *Dhrumil Purohit*

# **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on each of his claims that are triable before a jury.

Dated: July 14, 2025

Respectfully Submitted,

ORSUS GATE LLP
Denis Shmidt
Nabil Bisharat
Patricia Rojas-Castro

By: _____
Denis Shmidt
*Attorneys for Plaintiff*
*Dhrumil Purohit*