# EXHIBIT A

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Settlement and Release Agreement (the "Agreement") is entered into by and between Dhru Purohit ("Dhru"), Harshal Purohit ("Harshal"), Kaya Purohit ("Kaya"), and Farmacy LLC ("Farmacy; together with Dhru, Harshal, and Kaya, the "Purohits"), on the one hand, and Mark Hyman ("Mark"), Brianna Bella-Hyman ("Brianna"), Hyman Digital, LLC ("HD"), Hyman Enterprises, LLC, Hyman Integrative Therapies, LLC, and Vitamin Portfolio, LLC (collectively, the "Hymans"), on the other hand.  Individually, each is a "Party" and together they are the "Parties".

## RECITALS

WHEREAS, in 2015, Dhru and Mark formed HD;

WHEREAS, Mark is the 80% member and manager of HD;

WHEREAS, Dhru is the 20% member of HD;

WHEREAS, for the duration of his employment with HD, Dhru was employed as HD's CEO;

WHEREAS, Harshal and Kaya are also former employees of HD;

WHEREAS, in November 2019, Dhru and Mark created Farmacy;

WHEREAS, Dhru and Mark are 50/50 owners of Farmacy with Dhru acting as its manager;

WHEREAS, in late 2023, Dhru resigned as HD's CEO;

WHEREAS, under the HD Operating Agreement, upon Dhru's resignation as HD's CEO, HD was required to repurchase Dhru's membership interest in HD;

WHEREAS, several disputes arose between the Parties relating to the business of HD and Farmacy;

WHEREAS, on July 11, 2024, Dhru commenced a lawsuit in the U.S. District Court, District of Massachusetts against HD, as well as Mark (both individually and derivatively on behalf of HD), Case No. 1:24-cv-11784 (the "Massachusetts Claims");

WHEREAS, on July 23, 2024, Mark withdrew from Farmacy pursuant to its operating agreement;

WHEREAS, on August 2, 2024, HD asserted counterclaims in the same Massachusetts case against Dhru (the "Massachusetts Counterclaims"; together with the Massachusetts Claims, the "Massachusetts Litigation");

WHEREAS, on August 15, 2024, Dhru and Farmacy initiated an arbitration against Mark before JAMS, JAMS Arbitration No. 5220006899 (the "Farmacy Arbitration"); and

WHEREAS, the Parties desire to enter into a settlement to resolve the ownership of HD, Farmacy, and the companies' respective assets, and to globally settle any and all disputes they have against one another and their agents/affiliates, including, without limitation, the Massachusetts Litigation and the Farmacy Arbitration.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the promises, covenants, and agreements contained herein, the adequacy of which are hereby acknowledged, the Parties agree as follows:

1. <u>Effective Date</u>.  The Agreement shall become effective upon execution of the Agreement by all Parties (the "Effective Date").

2. <u>HD Settlement</u>.  Within fifteen (15) days of the Effective Date, Mark and HD shall pay or cause to be paid to Dhru $1,671,052.00 (the "HD Settlement Amount").  Mark and HD agree to each be equally, jointly, and severally liable for the full HD Settlement Amount. Transfer of Dhru's shares in HD shall be effectuated on the date upon which the $1,671,052.00 payment is received by Dhru and, upon receipt of this payment, Mark shall automatically become the effective owner of Dhru's entire Membership Interest in HD and Dhru's rights, obligations as an owner or member, including, without limitation, his non-compete obligation, shall cease immediately on that date. The Parties agree that this payment constitutes appropriate and valuable consideration for the terms, conditions, and obligations set forth herein as well as full consideration for the transfer of all shares Dhru has in HD to Mark or an assignee of Mark's designation. The Hymans understand and agree that distribution of the HD Settlement Amount by and among the Purohits shall be solely at the discretion of the Purohits and the Purohits agree that fulfillment of the payment terms herein shall constitute due and valuable consideration to support the mutual releases and obligations herein as to all Released Parties (as that term is defined below). The HD Settlement Amount payment shall be made via wire transfer to an account of Dhru's choice, which will be provided in a separate communication.

3. <u>Farmacy Settlement</u>.  Immediately upon the Effective Date, in exchange for settlement of all current and future litigation with respect to Farmacy, as well as a discount on the HD Settlement Amount, Mark will automatically transfer his membership interest in Farmacy to Dhru, who shall automatically become the effective owner of Mark's entire Membership Interest in Farmacy and Mark's rights and obligations as an owner or member, including, without limitation, his non-compete obligation, shall cease immediately on that date. The Parties agree that this Agreement (including but not limited to the discount on the HD Settlement Amount) constitutes appropriate and valuable consideration for the terms, conditions, and obligations set forth herein as well as full consideration for the transfer of all shares Mark has in Farmacy to Dhru or an assignee of Dhru's designation. Within fifteen (15) days of the Effective Date, Mark shall cooperate with Dhru to issue joint instructions to TD Bank, informing it of the change in ownership as to Farmacy and instructing it to provide Dhru unfettered and

sole control over Farmacy's TD Bank account (Account No. 825-8580014) (the "TD Bank Account"). Except as required to effectuate the terms of this Agreement, Mark shall not interfere in any way with Dhru's access to, or control over, the TD Bank Account. Within fifteen (15) days of the Effective Date, any and all references to and association with Dr. Hyman or "the Hyman's'" name, image, and likeness and affiliation with Farmacy, Gut Food or GutFood will be removed from Farmacy's websites Farmacy.com and Gutfood.com. Farmacy will not include Dr. Hyman's name, image, or likeness in any future social media posts or advertising but is not required to remove Dr. Hyman's name, image or likeliness from social media posts or advertisements that pre-date the Effective Date.

      4.      <u>Dismissal of the Massachusetts Litigation and Farmacy Arbitration</u>. Within five (5) business days of the Effective Date, the Parties will file notices of settlement in both the Massachusetts Litigation and Farmacy Arbitration. Within five (5) business days after payment of the HD Settlement Amount, the parties shall dismiss all claims in the Massachusetts Litigation and the Farmacy Arbitration. All dismissals shall be with prejudice.

      5.      <u>Time is of the Essence</u>. Time is of the essence in complying with the dates in this Agreement. If the Hymans fail to make all or any portion of the settlement payments set forth in Section 2 more than five (5) days after the applicable due dates, for any reason other than material breach of the Agreement by Dhru or his agents, the Hymans will be in default of this Agreement, and Dhru shall be immediately entitled to pursue collection of the full 1,671,052.00 (less any payments already made) and any other damages sustained as a result of the default. The Parties further agree that nothing in this section shall be construed to limit the Parties' recovery in the event of a breach of the Agreement.

      6.      <u>Assignment and Recognition of Ownership of Rights.</u>

    a. The Parties hereby recognize Dhru's rights and ownership over the following and, to the extent necessary, agree to and hereby do assign, convey, and transfer to Dhru or his assignee of choice any and all rights and ownership interest the Hymans may have in:

        i. the social media channels comprising the Instagram account "@dhrupurohit" and the YouTube account "@dhrupurohit";

        ii. the intellectual property rights, including copyrights and trademarks, associated with the *Try This* Newsletter and email list, and *The Dhru Purohit* Podcast; provided, however, that nothing in this section shall prevent HD utilizing its own email lists, even if there exists an overlap between persons on the *Try This* email list and HD's email lists; and

        iii. the social media channels comprising the Instagram account "@dhrupurohit," the YouTube account "@dhrupurohit and associated YouTube channel (www.youtube.com/@dhrupurohit), Dhru's Apple account (account associated with Dhru's name), Dhru's personal and business Facebook accounts (accounts associated with Dhru's name), Dhru's X or Twitter account (@dhrupurohit), Dhru's Spotify account

      (account associated with Dhru's name), Dhru's TikTok account (@Dhru.Purohit), and the A-Cast account for the Dhru Purohit podcast (associated with the following email address: dhru@hey.com).

  iv.  Subject to the exceptions discussed below, the Farmacy brand, trademarks, customer list, listserv, the "GutFood" and "Gut Food" trade names, the gutfood.com web domain, and other intellectual property that Mark created, authored, invented, or received, whether jointly or individually, in the course and scope of his membership in Farmacy except for any such rights conveyed in Section 6(c), below.

  v.  This section shall only apply to trademarks, copyrighted material, inventions, and other intellectual property that were authored, created, or conceived and reduced to practice, in the scope of Mark's Membership and/or employment with Farmacy. Within five (5) business days of the Effective Date, the Hymans will confirm that they have deleted any copies they may have of Farmacy's customer list or listserv. Nothing in this section shall prevent the Hymans from utilizing their own email lists, even if there exists an overlap between persons on the Farmacy email list and the Hyman's email lists or listservs.

b.  The Parties further agree to wait until March 1, 2025 to make a formal announcement regarding Dr. Hyman's disassociation from Farmacy unless Farmacy first (1) changes the Gut Food formula; (2) begins selling a new product; or (3) partners with a new doctor (collectively, the "Change in Farmacy's Circumstances"). On either March 1, 2025, or upon a Change of Farmacy's Circumstances, whichever comes first, Farmacy will issue an email to its listserv with the following language: "This email is to notify you that Dr. Mark Hyman is no longer involved or associated with Farmacy or Gut Food, including its formulation and marketing. You may still purchase the product at www.gutfood.com. Wishing you the best of health." On either March 1, 2025, or upon a Change of Farmacy's Circumstances, whichever comes first, Dr. Hyman may also announce his disassociation from Farmacy using the following statement: " I am no longer involved or associated with Farmacy or Gut Food, including its formulation and marketing. You may still purchase the product at www.gutfood.com. Wishing you the best of health."

c.  The Parties hereby recognize HD's rights and ownership to the following and, to the extent necessary, Dhru agrees to and hereby does assign, convey, and transfer to Mark or his assignee of choice any and all rights and ownership interest Dhru may have in:

  i.  The HD brand, trademarks, and other intellectual property that Dhru created, authored, invented, or received, whether jointly or individually, in the course and scope of his employment by HD, except for any such rights conveyed in Section 6(a) above. This section shall only apply to

4

    trademarks, copyrighted material, inventions, and other intellectual property that were authored, created, or conceived and reduced to practice, in the scope of Dhru's Membership and/or employment by HD.

   ii. The Broken Brain podcast and related intellectual property (subject to the below license).

   iii. All email distribution lists associated with Broken Brain or the Dhru Purohit Podcast that were created while Dhru was employed by HD, except for any such rights conveyed in Section 6(a) above.

 d. The Parties agree to effectuate all necessary communications, authorizations, releases, assignments, and to grant all access or authority necessary to effectuate a transfer of the above rights.

7. <u>License to *The Broken Brain* Podcast</u>.  The Parties acknowledge and agree that *The Broken Brain* podcast is solely and entirely owned by HD, and that HD owns valid trademarks for "The Broken Brain" and copyrights for *The Broken Brain* podcast episodes 9, 33, 48, 70, and 145. However, HD hereby grants Dhru a world-wide, non-exclusive, license to *The Broken Brain* podcast episodes that were hosted by Dhru. Dhru's use of *The Broken Brain* podcast shall be limited in the following two ways: (1) after the Effective Date, Dhru may not create any new derivative works from any previous *The Broken Brain* podcast episodes; and (2) Dhru may not directly advertise any previous *The Broken Brain* podcast episodes. Dhru agrees that he shall not intentionally place advertisements or cause such advertisements to be placed (*e.g.*, by including ad breaks or markers in episodes subscribed to Automated and Dynamic Ads) on the *Broken Brain* episodes that are subject to this license and, further, that all *Broken Brain* episodes that Dhru hosts on any of his platforms or channels, as part of his back catalog or otherwise, shall be clearly identified as belonging solely to Hyman Digital and a link to Hyman Digital shall be included in the notice of attribution. Nothing in this section shall prohibit Dhru from placing advertisements on, or otherwise generating ad revenue from, other episodes of Dhru's podcast that are not branded as *Broken Brain* episodes or from allowing advertisements to be placed on his channel as a whole so long as such advertisements are not placed on or within any *Broken Brain* podcast episodes.

 a. <u>No Liability For Third Party Infringement</u>.  This license shall not provide for any right of accounting to HD and Mark. Dhru shall not be responsible if a *The Broken Brain* podcast episode is advertised by a third party (such as YouTube) or if it is incorrectly attributed to him by any third party without direct or indirect authorization by Dhru (*e.g.*, by the placement of ad markers or "opting in" to the placement of ads on a podcast episode). For the sake of clarity, pursuant to this license, Dhru shall not be prohibited from directly advertising any previous episodes of *The Dhru Purohit* podcast, even if such episodes contained a reference to, discussion of, or clips from any *The Broken Brain* podcast episodes and any and all future income streams relating to the *Dhru Purohit* podcast including but not limited to direct advertising revenue shall belong solely to Dhru. Violation of the terms of this license shall constitute a material breach of this Agreement.

5

    b. <u>YouTube Hosting Provision</u>.  The Parties acknowledge that Dhru has a verified YouTube channel called "The Dhru Purohit Show" (username: @DhruPurohit) that hosts prior Broken Brain episodes hosted by Dhru and subject to the license agreement set forth herein. Dhru represents and warrants that he has not placed ad markers or opted into any dynamic or automatic ad placement program on the platform, but that he has opted into channel-wide, pre-roll advertisements. The Parties hereby agree that, as part of Dhru's license, he shall be afforded a grace period, commencing on the Effective Date and ending on December 31, 2025 (the "Grace Period"), to "opt-out" of YouTube advertising on Broken Brain episodes that are subject to this license agreement. The placement of advertisements on any Broken Brain episodes during the Grace Period shall not be considered a violation of the Dhru's license agreement or infringement of HD's intellectual property rights. Thereafter, Dhru shall turn off video monetization for each and every Broken Brain episode subject to the license agreement via the YouTube Platform. The placement of any advertisement from *Broken Brain* podcast episodes by Dhru, after the Grace Period, shall constitute a material breach of this Agreement. However, any advertisements placed on Broken Brain episodes beyond Dhru's control shall not constitute a breach. Examples of advertisements beyond Dhru's control include, but are not limited to, YouTube unilaterally placing advertisements on Broken Brain episodes without Dhru's consent or YouTube denying Dhru the ability to turn monetization off for specific episodes.

    c. <u>Revocation</u>.  The license shall be revocable only in the event of a material breach of this Agreement or infringement of HD's intellectual property rights. By way of example but not limitation, this license shall be revocable by HD in the event that Dhru violates the terms of this license by affirmatively placing advertisements or causing advertisements to be placed within episodes of Broken Brain, including by directing YouTube to place ads on Broken Brain episodes subject to this license. In the event that the Hymans believe that a breach has occurred sufficient to justify revocation of the license under this Agreement, the Hymans shall provide written notice by sending an email to Dhru at dhru@hey.com and counsel for Purohits, Denis Shmidt at dshmidt@orsusgate.com and Nabil Bisharat at nbisharat@orsusgate.com (the "Notice"). The Purohits shall then have five (5) business days following the date of Notice to cure (the "Cure Period"). The Hymans may not revoke The Broken Brain license if the alleged default is cured within the Cure Period. However, the Parties agree that (1) failure to cure the identified violation on a timely basis during the notice period shall constitute willful infringement if a violation of the license is found and (2) any lawsuit filed by Dhru during the notice period shall not be afforded deference under the "first to file" doctrine.

    8.    <u>Sunset of Trade Names</u>.  The Parties agree that, by no later than April 30, 2025, (the "Sunset Period"), Dhru shall cease using the following specific trade names (the "Farmacy Trade Names"): "Farmacy", "GutFood", and "Gut Food." The Farmacy Trade Names shall continue to belong to Farmacy but may not be used by Dhru after the Sunset Period. Dhru may

6

not use the gutfood.com domain name after the Sunset Period but may automatically redirect anyone attempting to access that URL to a non- Farmacy Trade Name website. At no time may the Hymans ever use the Farmacy Trade Names.

      9.      <u>IRS Schedule K-1 (Form 1065)</u>.  By no later than September 15, 2024, HD shall issue to Dhru an IRS Schedule K-1, Form 1065 (the "K-1") for 2023 indicating that Dhru's membership interest in HD terminated effective September 12, 2023. By no later than September 15, 2024, Farmacy shall issue a K-1 to Mark for 2023. In 2025, Farmacy shall issue to Mark a K-1 indicating that Mark's membership interest in Farmacy terminated on July 27, 2024.

              a.    <u>Indemnification</u>:  While the Parties dispute the end date of Dhru's employment and membership with HD, for the purposes of this provision only, HD agrees to accede to Dhru's request to identify the termination date of Dhru's membership in HD as September 12, 2023, on his K-1. Dhru understands that by so agreeing, HD is not making any representations or guarantees about the tax implications of this provision and further that Dhru agrees to indemnify and defend HD to the extent of any tax liens, investigations, audits, or liability relating to or arising from HD's agreement to identify September 12, 2023, as the end date of Dhru's membership interest in his K-1.

      10.     <u>Mutual Release</u>.  Upon Dhru's receipt of the full HD Settlement Amount, and except for the obligations set forth under this Agreement, and in consideration of the promises, covenants, and agreements contained herein, the Purohits on the one hand, and the Hymans, on the other hand, on behalf of themselves and each of their respective employees, directors, officers, members, representatives, shareholders, insurers, divisions, subsidiaries, predecessors, successors, assigns, (the "Releasing Parties"), mutually agree to unconditionally, irrevocably and forever release and discharge each other, as well as each of other's current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, benefit plans, plan administrators, insurers, trustees, heirs, estate, divisions, and subsidiaries, and predecessor and successor corporations and assigns (collectively, the "Releasees"), and agree and covenant not to sue concerning, or in any manner to institute, prosecute, or pursue, any claim, complaint, charge, duty, obligation, demand, or cause of action they ever had, now have, or may now have against one another, from the beginning of time up until and including the Effective Date of this Agreement. This release is intended to be read as broadly as possible. Pursuant to this release, the Releasing Parties agree that they shall not pursue or further pursue any claim, dispute, controversy, cause of action, lawsuit, arbitration, damages, penalties, fees (attorneys' fees or otherwise), or costs arising out of, relating to, or in connection with: (a) the matters encompassed in this agreement; (b) the matters encompassed in the Massachusetts Litigation and the Farmacy Arbitration (including matters that could have been brought in the Massachusetts Litigation or Farmacy Arbitration); (c) any ownership right, title, or interest and/or any other equity right, title, or interest arising out of and/or relating to HD and/or Farmacy; and/or (d) each of the Purohits' respective employments and/or engagements with HD, as applicable, including without limitation any compensation, benefits, or other remuneration in connection therewith; (e) each of the Hymans' respective employments and/or engagements with Farmacy, as applicable, including without limitation any compensation, benefits, or other remuneration in connection therewith; and/or (f) any claims they may have against one another.

The scope of the Parties' releases in this Agreement includes but are not limited to a full and general release of any and all claims or potential claims as they may have against the Hymans and/or any other Released Parties for: (i) any and all claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967 (ADEA), the Family and Medical Leave Act (FMLA), the Employee Retirement Income Security Act (ERISA), the National Labor Relations Act (NLRA), the Pregnancy Discrimination Act, the Worker Adjustment and Retraining Notification Act, the Americans with Disabilities Act (ADA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), any amendments to such laws, any other federal, state, or local constitution, charter, law, rule, ordinance, regulation, or order; (ii) claims based on veterans status; (iii) claims in equity or under common law including but not limited to claims for tort, breach of contract (express or implied, written or oral), wrongful discharge, defamation, emotional distress, and negligence; (iv) any and all claims arising under the California Labor Code, the California Government Code, or the California Business & Professions Code; (v) any and all claims arising under common law for intentional or negligent infliction of emotional distress, fraud, misrepresentation, defamation, interference with contract or other interests, or any other claims or causes of action for damages or monetary obligations of any nature, including without limitation, actual, compensatory, punitive, and liquidated damages, penalties, and attorneys' fees, costs and expenses; and (vi) any claims for injunctive relief or declaratory relief.

The foregoing notwithstanding, nothing contained herein shall constitute a release of any claims to enforce this Agreement or any rights or claims that cannot be waived as a matter of law, including, without limitation, any rights or entitlements under California or other law for workers' compensation indemnity benefits under California's Workers' Compensation Act, or for unemployment or State Disability Insurance ("SDI") benefits under the California Unemployment Insurance Code.

11.     <u>Release of Unknown Claims</u>.  It is further understood and agreed by the Releasing Parties to this Release that all rights under section 1542 of the California Civil Code, and any similar law of any state or territory of the United States, ARE HEREBY EXPRESSLY WAIVED. Said section reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Releasing Parties hereby acknowledge that they have had the opportunity to consult with legal counsel before agreeing to the terms of this Release, and that they fully understand its meaning, including the meaning and effect including the provisions relating to section 1542 of the California Civil Code.

    12.    <u>Representations & Warranties by the Purohits</u>.  The Purohits represent, warrant and acknowledged that the Hymans relied on the following representations by the Purohits when entering into this agreement:

    a.    Other than the HD Settlement Amount due and payable hereunder, the Purohits have received all compensation due to them as a result of services performed for the Hymans.

    b.    The Purohits have reported to the Hymans any and all work-related injuries or occupational illnesses incurred by them during their employment with HD, if any.

    c.    The Purohits were provided with any leaves of absence or other accommodations for their injuries, health conditions, or other covered conduct, and the Purohits were not subject to any improper treatment, conduct, or actions due to any request for or taking of such leave.

    d.    The Purohits have been afforded a reasonable opportunity to provide HD/Farmacy with written notice of any and all concerns regarding known or suspected ethical or compliance issues or other legal violations on the part of HD, Farmacy, its officers, members, employees or agents.

    e.    Aside from the Massachusetts Claims and the Farmacy Arbitration, the Purohits have not filed any other pending complaints, claims, lawsuits, or actions against the Hymans, or the Hymans' officers, board of directors, agents, supervisors, employees, attorneys or representatives, insurers or related or affiliated companies or entities with any state, federal or local agency, court or other authority; nor have the Purohits actively participated in an action brought by any third party against the Hymans.

    f.    Upon full execution of this Agreement, the Purohits and their counsel will no longer be preparing, contemplating, or cooperating in the pursuit or preparation of any other claims or litigation against the Hymans.

    g.    The undersigned has the full legal capacity, right, power, and authority to enter into this Agreement and has obtained all necessary consultations, consents, and approvals necessary to make the representations, warranties, and agreements herein.

    13.    <u>Representations & Warranties by the Hymans</u>.  The Hymans represent, warrant and acknowledged that the Purohits relied on the following representations by the Hymans when entering into this agreement:

    a.    Other than the amounts payable under this agreement, the Hymans have received all compensation due to them as a result of services performed for the Purohits.

    b.   The Hymans have reported to the Purohits any and all work-related injuries or occupational illnesses incurred by them during their employment with Farmacy, if any.

    c.   The Hymans were provided with any leaves of absence or other accommodations for their injuries, health conditions, or other covered conduct, and the Hymans were not subject to any improper treatment, conduct, or actions due to any request for or taking of such leave.

    d.   The Hymans have been afforded a reasonable opportunity to provide Farmacy with written notice of any and all concerns regarding known or suspected ethical or compliance issues or other legal violations on the part of Farmacy, its officers, members, employees or agents.

    e.   Aside from the Massachusetts Counterclaims, the Hymans have not filed any other pending complaints, claims, lawsuits, or actions against the Purohits, or the Purohits' officers, board of directors, agents, supervisors, employees, attorneys or representatives, insurers or related or affiliated companies or entities with any state, federal or local agency, court or other authority; nor have the Hymans actively participated in an action brought by any third party against the Purohits.

    f.   Upon full execution of this Agreement, the Hymans and their counsel will no longer be preparing, contemplating, or cooperating in the pursuit or preparation of any other claims or litigation against the Purohits .

    g.   The undersigned has the full legal capacity, right, power, and authority to enter into this Agreement and has obtained all necessary consultations, consents, and approvals necessary to make the representations, warranties, and agreements herein.

14.    <u>Costs and Attorneys' Fees</u>.  Each Party shall bear its own costs and fees, including any attorneys' fees or expert fees, accumulated up to the Effective Date.  However, in the event of a dispute arising from or otherwise related to this Agreement, the prevailing party shall be entitled to recover all reasonable costs, including attorneys' fees.

15.    <u>Confidentiality</u>.  From the Effective Date and for all times thereafter, the Parties agree to maintain in complete confidence the existence of this Agreement, the contents and terms of this Agreement, the consideration for this Agreement (hereinafter collectively referred to as "Settlement Information"). Except as required by a court order or subpoena, or as required by a governmental agency, or in an adjudicative proceeding regarding a dispute related to this Agreement, the Parties may disclose Settlement Information only to their immediate family members, their attorney(s), and their accountant and any professionals or tax advisor to the extent that they need to know the Settlement Information in order to provide advice on tax treatment or to prepare tax returns. The Parties agree that they will not publicize, directly or indirectly, or induce, instruct, or encourage any third party to publicize, directly or indirectly, any Settlement Information. Nothing in this paragraph shall be construed to prohibit a Party from

discussing or disseminating this Agreement among the Releasees, so long as reasonable steps are taken to ensure the Agreement's confidentiality.

In the event that a party is notified of, or otherwise becomes aware of, any litigation, court order, subpoena, or tax audit, requiring or requesting disclosure of any Settlement Information or information related to this Agreement, including the Agreement's terms, the party shall notify the other parties to this Agreement in writing by email, within five (5) business days after the party is notified or becomes aware of such litigation, court order, subpoena, or tax audit, and before disclosing any Settlement Information or information related to this Agreement, including the Agreement's terms, and shall only disclose such information as determined necessary for compliance after consultation with counsel. In the event such disclosure is determined necessary after consultation with counsel, the party shall use best efforts to ensure that such information is accorded confidential treatment.

16. <u>Mutual Non-Disparagement</u>. From the Effective Date and for all times thereafter, the Parties agree that they shall not make, publish, or communicate any Disparaging Statements to any third party, or encourage a third party to make, publish, or communicate any Disparaging Statements. For purposes of this Agreement, the term "Disparaging Statements" is defined as any communications that create a detrimental, negative, critical, unfavorable, or false impression: (i) regarding the conduct of any Party, or any of the goodwill or business or reputation of any Party; or (ii) any Parties' character, reputation, honesty, integrity, morality, ethics, judgment, competence, intelligence or abilities. The Parties further agree that monetary damages alone for any violation under this section are insufficient and that, in addition to monetary damages or any other legal recourse, immediate injunctive relief is appropriate to prevent further harm. Due to the difficulty of assessing damages for a breach under this section, the Parties agree that liquidated damages of $25,000 per instance of breach are a reasonable measure of damages and may be used in lieu of proving actual damages. The Parties agree that this liquidated damages provision is not a penalty but a realistic attempt by the Parties to calculate the damages stemming from such a breach. The Parties further agree that neither Party is precluded from seeking actual damages for breach of this provision.

   a. Notwithstanding the foregoing, the Purohits shall not be liable under this "non-disparagement" section for statements, remarks, or comments made by third parties, even if such statements, remarks, or comments are part of a Purohit-hosted show or podcast or in an event with which any of the Purohits are associated. Similarly, the Hymans shall not be liable under this "non-disparagement" section for statements, remarks, or comments made by third parties, even if such statements, remarks, or comments are part of a Hyman-hosted show or podcast or in an event with which any of the Hymans are associated. Neither Party will encourage or intentionally cause any third party to make Disparaging Statements about the other.

   b. Notwithstanding the foregoing, in response to any inquiry from a third person concerning this Agreement or the dismissal of the Massachusetts Litigation, the Parties agree that they will limit their responses to a statement as follows: "We came to an agreement" or "This matter has been resolved." The only

11

    other statement that any Party or their counsel may make is to state that they will make "no comment" or "no further comment."

    c. Notwithstanding the foregoing, the Parties acknowledge that the pleadings and other filings in Massachusetts Litigation are publicly available. Neither the Hymans nor the Purohits shall be liable for any independent reporting on, dissemination of, or other commenting on the Massachusetts Litigation by any third party.

  17. <u>No Admission of Liability</u>.  The Parties understand and acknowledge that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims between the Parties. No action taken, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission of any fault or liability whatsoever to one another or to any other party.

  18. <u>Right to Engage in Protected Activity</u>.  Nothing in this Agreement (a) prevents any individual from discussing or disclosing information about unlawful acts in the workplace to appropriate authorities or as necessary to protect their rights or fulfill their legal obligations; (b) limits or affects any individuals' right to challenge the validity of this Release under the ADEA or the OWBPA; (c) prevents the Parties from communicating with, filing a charge or complaint with, providing documents or information voluntarily or in response to a subpoena or other information request to, or from participating in an investigation or proceeding conducted by, the Equal Employment Opportunity Commission, National Labor Relations Board, the Securities and Exchange Commission, law enforcement, or any other any federal, state or local agency charged with the enforcement of any laws; or from testifying, providing evidence, or responding to a subpoena or discovery request in court litigation or arbitration; (d) prevents a non-management, non-supervisory employee from engaging in protected activity under section 7 of the NLRA or similar state law such as joining, assisting, or forming a union, bargaining, picketing, striking, or participating in other activity for mutual aid or protection, or refusing to do so; this includes using or disclosing information acquired through lawful means regarding wages, hours, benefits, or other terms and conditions of employment, except where the information was entrusted to the employee in confidence as part of the employee's job duties. However, by signing this Release, the Released Parties understand and agree that they are waiving any right to recover any individual relief (including any backpay, front pay, reinstatement or other legal or equitable relief) in any charge, complaint, or lawsuit or other proceeding brought by the Purohits or on behalf by any third party, except for any right the Purohits may have to receive a payment or award from a government agency for information provided to the government agency or where otherwise prohibited.

  19. <u>Tolling</u>. All periods of limitation (statutory or otherwise) affecting any claim or causes of action that any of the Parties may have against one another shall be tolled from the Effective Date through either (1) the end of May 1, 2027, or (2) the mutual performance of all obligations set forth herein including but not limited to payment of the Settlement Amount; whichever comes first. The Parties agree and covenant not to sue for any of the claims set forth in Section 10 (Mutual Release) absent material breach and revocation of this Agreement.

12

20. <u>Reasonable Cooperation/Additional Documents</u>. The Parties agree to cooperate fully and execute any and all supplementary documents and take any additional action that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

21. <u>Independent Advice of Counsel</u>. The Parties acknowledge that they have been represented by legal counsel and have freely assented to this Agreement, which has not involved coercion, undue influence or economic pressure or duress.

22. <u>Validity</u>. This Agreement shall be construed as though all Parties have participated equally in its drafting, and it shall be interpreted, wherever possible, to make it valid and effective. If any portion of this Agreement is deemed by a court or other authority of competent jurisdiction to be invalid, prohibited, illegal, unenforceable, or void, only that portion should be affected, and the rest of the Agreement shall be enforced as written here. The headings used in this Agreement are for organizational purposes only and shall not be interpreted or construed as material terms of the Agreement.

23. <u>Authority</u>. Each signatory represents and warrants that it has the right, power, legal capacity and authority to enter into, and perform, all respective obligations under this Agreement. To that end, each party and signatory to this Agreement agrees to indemnify, pay for, and hold the other harmless from any liability, claim, demand, damage, expense and attorneys' fees incurred by the other as a result of any assertion that the individual who executed this Agreement was not authorized to do so.

24. <u>Successors, Assigns and Beneficiaries.</u> This Agreement, and all of its terms, shall inure to the benefit of, and shall be binding upon, the successors, assigns, executors, representatives, beneficiaries and attorneys of the Parties.

25. <u>Amendments, Modifications, Waivers</u>. This Agreement may not be modified or amended, and no provision or benefit hereof may be waived, except in a written document executed by the Parties.

26. <u>No Representations</u>. Each Party represents that it has had an opportunity to consult with an attorney and has carefully read and understands the scope and effect of the provisions of this Agreement. Each Party represents that it has not relied on any representations or statements made by any other Party that are not specifically set forth in this Agreement.

27. <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by the laws of the State of Massachusetts, without regard for any choice-of-law provisions. The Parties consent to personal and exclusive jurisdiction and venue in the State of California, County of Los Angeles, for any action to enforce this Agreement or any disputes arising out of or otherwise related to this Agreement.

28. <u>Integration</u>. This Agreement constitutes the sole agreement and understanding of the Parties hereto concerning the subject matter hereof and supersedes all prior oral and written agreements relating to resolution of the matters set forth herein, including any agreements between Dhru and HD related to *The Dhru Purohit* Podcast and *Try This* Newsletter. The Parties further agree that the Employment Services Agreement between Dhru and HD has been

terminated and has been fully satisfied without any further obligation owed by either one to the other and that the Purohits are no longer bound by any non-compete or non-solicitation agreements with any of the Hymans (including with HD, Hyman Enterprises, LLC, Hyman Integrative Therapies, LLC, and Vitamin Portfolio, LLC). However, nothing in this agreement shall abrogate or undermine the post-employment / post-withdrawal confidentiality obligations of any party hereto as set forth in the Hyman Digital Operating Agreement Section 15.3 and the July 1, 2015, Executive Services Agreement Sections 5. For the avoidance of doubt, the Parties agree that the Hymans and the Purohits shall be released from any and all post-employment restrictive covenants prohibiting competition or solicitation that would violate California Business & Professions Code § 16600 and shall only be bound to the HD Operating Agreement Section 15.3 and/or the Executive Services Agreement Section 5 insofar as necessary to foreclose disclosure, misuse, dissemination, or misappropriation of HD trade secrets and other intellectual property assigned or acquired by Dhru in the course and scope of his employment/ membership in HD. The Parties agree that this Agreement constitutes full satisfaction of HD's notice obligations and shall be construed in accordance with California Business & Professions Code § 16600.1. For the avoidance of doubt, Dhru is and has been effectively notified that any non-compete agreement between Dhru and HD is void.

29. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement may be executed electronically, and each electronic signature shall be deemed to be an original.

**DHRU PUROHIT**

By: _____

Printed: Dhru Purohit
Title: Individual
Date: 8/30/2024 _____

**MARK HYMAN**

By: _____

Printed: Mark Hyman
Title: Individual
Date: 8/30/24 _____

**HARSHAL PUROHIT**

By: _____

Printed: Harshal Purohit
Title: Individual
Date: 8/30/2024 _____

**HYMAN DIGITAL, LLC**

By: _____

Printed: Mark Hyman
Title: Managing Member
Date: 8/30/24 _____

14

**KAYA PUROHIT**

By: _____

Printed: Kaya Purohit
Title: Individual

Date: 8/30/2024 _____


**FARMACY LLC**

By: _____

Printed: Dhru Purohit
Title: Managing Member

Date: 8/30/2024 _____


**HYMAN INTEGRATIVE THERAPIES, LLC**

By: _____

Printed: Mark Hyman
Title: Member

Date: 8/30/24 _____


**HYMAN ENTERPRISES, LLC**

By: _____

Printed: Mark Hyman
Title: Member

Date: 8/30/24 _____


**VITAMIN PORTFOLIO, LLC**

By: _____

Printed: Mark Hyman
Title: Member

Date: 8/30/24 _____


**BRIANNA BELLA-HYMAN**

By: _____

Printed: Brianna Bella-Hyman
Title: Individual

Date: 08/30/2024 _____

15