# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| DHRUMIL PUROHIT, individually, and derivatively on behalf of HYMAN DIGITAL, LLC, | Case No. 1:24-cv-11784 |
| Plaintiff, | **VERIFIED COMPLAINT FOR:** |
| v. | **(1) Breach of HD Operating Agreement – Failure to Purchase Membership** |
| MARK HYMAN and HYMAN DIGITAL, LLC, | **(2) Breach of HD Operating Agreement – Failure to Make Distributions** |
| Defendants. | **(3) Breach of the Implied Covenant of Good Faith and Fair Dealing** |
| | **(4) Breach of Fiduciary Duty (Direct)** |
| HYMAN DIGITAL, LLC, | **(5) Breach of Fiduciary Duty (Derivative)** |
| | **(6) Misappropriation of Corporate Opportunity (Derivative)** |
| Nominal Defendant. | **(7) Authorship of Copyrights –** *The Dhru Purohit Podcast* |
| | **(8) Authorship of Copyrights –** *Try This* **Newsletter** |
| | **(9) Non-Infringement of Trademarks –** *The Dhru Purohit Podcast* **and** *The Dhru Purohit Show* |
| | **(10) Non-Infringement of Trademarks –** *Try This* **Newsletter** |
| | **(11) Declaratory Relief -** *The Dhru Purohit Podcast* |
| | **(12) Declaratory Relief -** *Try This* **Newsletter** |
| | **(13) Declaratory Judgment – Ownership of Social Media Accounts** |

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Plaintiff Dhrumil "Dhru" Purohit ("Plaintiff" or "Mr. Purohit"), by and through his attorneys, makes the following allegations against Defendant Hyman Digital, LLC ("Hyman Digital" or "HD") and Defendant Mark Hyman ("Dr. Hyman") in his individual capacity, and makes the additional allegations, derivatively, on behalf of Hyman Digital and against Dr. Hyman:

## I.      **INTRODUCTION**

1.      Dr. Hyman is an "influencer" doctor with multiple business ventures, including books, a supplements business, and a podcast.  Dr. Hyman is the 80% supermajority managing member of Hyman Digital.

2.      Mr. Purohit is a 20% minority member of Hyman Digital and, for eight years, has acted as its CEO.  During his tenure, Mr. Purohit grew Hyman Digital's revenue from $0 to $30 million dollars of gross revenue with $13 million of that comprising its net profits. By both total net profit and by profit margin, Hyman Digital is the crown jewel of Dr. Hyman's business ventures.

3.      This success was achieved despite Dr. Hyman's numerous unethical actions. Actions which constitute a material breach of his fiduciary duties to both Mr. Purohit and HD itself.  These actions include: sexually harassing HD employees and creating a hostile workplace; harming HD's bottom-line and reputation by engaging in questionable and potentially illegal tax strategies; making false, unsupported, and often cruel medical claims through HD's products; and using HD's resources for his personal benefit without any compensation to HD or its minority member (Mr. Purohit).

4.      Unwilling to continue to work with Dr. Hyman, Mr. Purohit tendered his

2

resignation on September 12, 2023.

5.      Under the HD Operating Agreement, upon his departure as HD's CEO, Mr. Purohit was entitled to a buyout of his membership interest based on a set formula.  Based on HD's Chief Financial Officer's application of this very formula, Mr. Purohit is entitled to a buyout of approximately $2,458,775.90.

6.      Rather than honor the Operating Agreement, HD (through Dr. Hyman) retaliated by withholding Mr. Purohit's contractually mandated buyout payments, accused Mr. Purohit of corporate malfeasance, and attempted to appropriate Mr. Purohit's personal social media accounts, all in a blatant attempt to retain the fruits of Mr. Purohit's work for himself.

7.      Not only has HD refused to honor Mr. Purohit's rights under the Hyman Digital Operating Agreement, it is concurrently attempting to appropriate all manner of content and other intellectual property connected with Mr. Purohit, no matter how attenuated the connection to his actual day-to-day responsibilities as CEO of HD, including a podcast bearing his name *(The Dhru Purohit Podcast)*, a newsletter Mr. Purohit created independently and separate from the Hyman Digital ecosystem, and most egregious of all, Mr. Purohit's personal YouTube, Instagram, Apple, and Spotify accounts, several of which exist under the name @DhruPurohit and all of which existed long before Mr. Purohit ever began working at HD.

8.      This is not the first time Dr. Hyman has abused his partnerships. In 2014, Dr. Hyman was sued by his then-partners for failing to keep his contractual promises after they saved his business from failure.  That lawsuit ended in a settlement in March of 2015 – mere months before Dr. Hyman partnered with Mr. Purohit – further ensconcing Dr. Hyman's *modus operandi* of making promises to his partners that he has no intention of keeping.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

9.      Mr. Purohit now seeks to enforce his buyout; confirm his ownership interest in his various social media accounts, personal podcast, and newsletter; and hold Dr. Hyman accountable for his various bad acts and breaches of his fiduciary duties.

## II.      **PARTIES**

10.      Plaintiff Dhru Purohit is a California citizen residing within Los Angeles County in California. He is a non-managing member of Hyman Digital LLC with a 20% equity stake in the company.

11.      Defendant Mark Hyman is a Massachusetts citizen residing within Berkshire County in Massachusetts. He is the supermajority member manager of Hyman Digital LLC, with an 80% equity stake in the company.

12.      Defendant (both nominal and actual) Hyman Digital, LLC is a Massachusetts limited liability company with its principal place of business at 55 Pittsfield Road, Lennox Commons, Suite 9, Lenox, Massachusetts 01240. HD has two members, Mr. Purohit and Dr. Hyman.

13.      On information and belief, Dr. Hyman has treated HD as his alter ego. On information and belief, Dr. Hyman has dominated and controlled HD; has commingled HD's asset and resources with his own, as well as with his other companies (which he also dominated and controls); has not observed HD's corporate formalities or kept adequate corporate records; has used HD as a mere shell for his affairs; has refused to pay its shareholders regular dividends; has kept HD inadequately capitalized; has siphoned away HD's funds, intellectual property, and opportunities for his own benefit; has appointed a figurehead (his wife) as HD's new CEO; has used HD for transactions to his exclusive benefit; and a unity of interest exists between Dr. Hyman and HD. Therefore, shielding Dr.

4

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Hyman from HD's liability—which he single-handedly caused—would promote injustice.

### III.     JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

14.     The Court has subject matter jurisdiction over Plaintiff's copyright claims

pursuant to The Copyright Act, 15 U.S.C. § 101 et seq., 28 U.S.C. § 1331, 28 U.S.C. §

1338(a), and 28 U.S.C. § 2201. The Court has subject matter jurisdiction over Plaintiff's

trademark claims pursuant to The Lanham Act, 15 U.S.C. § 101 et seq., 28 U.S.C. § 1331, 28

U.S.C. § 1338(a), and 28 U.S.C. § 2201 and the Lanham Act, 17 U.S.C. § 1051 et seq.

(Lanham Act). The Court has supplemental jurisdiction over the state law claims alleged in

this Complaint pursuant to 28 U.S.C. § 1367.

15.     As set forth above, at least one Defendant resides in this judicial district, and

all Defendants are residents of the Commonwealth of Massachusetts. In addition, a substantial

part of the events or omissions giving rise to the claims alleged in this Complaint occurred in

this judicial district. Venue therefore is proper in this district under 28 U.S.C. §§ 1391(b) and

1391(c).

16.     Lastly, pursuant to the Hyman Digital Operating Agreement ("HD OA" at

Article 15.8) and Executive Services Agreement ("ESA" at 9.E), both of which are at issue in

this matter, the parties agreed to submit to the jurisdiction of this Federal Court to adjudicate

disputes arising out of or related to these agreements.

### IV.     FUTILITY

17.     Mr. Purohit has been a member of HD since September 15, 2015. He remains a

member of HD as of the date of this filing.

18.     Given that Dr. Hyman is the supermajority owner and manager of Hyman

Digital, a request to have Hyman Digital pursue Dr. Hyman for his numerous breaches of his

5

fiduciaries duties to Hyman Digital would be futile.

19.    Mr. Purohit does not bring the causes of action derivatively on HD's behalf for
the purpose of conferring jurisdiction that the Court would lack otherwise.

## V.    FACTUAL ALLEGATIONS

### A.    Dr. Hyman and Mr. Purohit meet and quickly become friends.

20.    Mr. Purohit and Dr. Hyman first met through mutual friends in 2009. At that
time, Mr. Purohit was already the successful CEO of a company called Clean Program, which
made and sold vitamins under the umbrella of a cardiologist based in New York.

21.    While Dr. Hyman is a medical doctor in the field of functional medicine, in
2009, Dr. Hyman was primarily focused on publishing and promoting his diet and lifestyle
books as well as running small group programs and using his email list to promote partner
products and content.

22.    Dr. Hyman was impressed with the Clean Program's success under Mr.
Purohit's leadership and, shortly after their introduction, Dr. Hyman reached out to set a
meeting to discuss why his business was not as successful as Clean Program and to seek Mr.
Purohit's advice on what he should do to better situate his business for success.

23.    Between 2009 and 2015, Mr. Purohit spoke with Dr. Hyman a few times per
year to provide suggestions on how Dr. Hyman could grow his team and to provide guidance
on the importance of having the right team in place. Over those years, Dr. Hyman periodically
asked Mr. Purohit to join his team, but he politely declined.

24.    Then, in 2015, Mr. Purohit decided to move on from Clean Program. As Mr.
Purohit was gearing up to exit that company, Dr. Hyman reached out and asked, again, if he
was available to assist with transforming Dr. Hyman's business. The two men met in Los

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Angeles, and in March 2015, they entered into a limited-term consulting relationship wherein

Mr. Purohit would assist Dr. Hyman with turning around his book-publishing business

(Hyman Enterprises) under an independent contractor agreement.

25.     It did not take Dr. Hyman long to realize that he needed Mr. Purohit as more

than just an independent contractor advising from the sidelines. As such, in July 2015, the two

men executed a new Executive Services Agreement ("ESA") (**Exhibit A**), establishing Mr.

Purohit as CEO of a soon-to-be incorporated Hyman Digital, LLC.

26.     Shortly thereafter, HD formalized its Operating Agreement ("HD OA")

(**Exhibit B**), which went into effect as of September 15, 2015.

27.     Rather than receiving a high salary—commensurate with the market rate for

someone with his experience, position, and track record—Mr. Purohit agreed to a significantly

reduced salary in exchange for a 20% equity share in HD.

28.     As CEO, Mr. Purohit was to receive an annual salary of $140,000, $100,000 of

which would be deemed a capital contribution to the company in exchange for an additional

2.4% interest in HD. Mr. Purohit's compensation also included an additional 10% equity

interest in HD, which fully vested as of July 1, 2019, and an option to purchase an additional

5% interest in HD, which Mr. Purohit timely exercised.

29.     While Schedule A to the HD OA identifies Mr. Purohit as owning 4.8% of HD,

based on Mr. Purohit options as outlined in the ESA, he ultimately became a 20% minority

member of HD. HD has been issuing IRS Form K-1s to Mr. Purohit, confirming his 20%

membership interest in the company since 2016.

**B.     Mr. Purohit Revitalizes Dr. Hyman's Struggling, Chaotic and Disjointed
Mini-Empire.**

30.     In 2015, Dr. Hyman owned three primary businesses (collectively, with HD,

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

these will be referred to as the "Hyman Companies"):

  a. <u>Hyman Enterprises</u>: Hyman Enterprises focused exclusively on Dr. Hyman's book sales and royalties, his speaking engagements, and his digital courses. As a financially successful venture, Hyman Enterprises also ate up most of Dr. Hyman's attention, to the detriment of his two other business segments.

  b. <u>The Ultra Wellness Center</u>: Dr. Hyman ran a medical clinic called the Ultra Wellness Center, which focused on functional medicine. In 2015, the clinic was going through significant financial challenges, and declining in both revenue and sales, because Dr. Hyman was no longer focused on practicing medicine at the clinic.

  c. <u>Vitamin Portfolio</u>: Vitamin Portfolio was Dr. Hyman's vitamin distribution company. Like the Ultra Wellness Center, it too was suffering a decline in revenue in 2015.

31. In addition to the decline in business revenue, in 2015, Dr. Hyman's personal brand was extremely chaotic, disorganized, and lacked leadership and direction.

32. More importantly, although he was known for his *New York Times* best-sellers, Dr. Hyman's digital and social media presence was nearly non-existent at a time when social media had already become the dominant commercial force in the industry.

33. While his Executive Services Agreement stated that Mr. Purohit was only the CEO of Hyman Digital, almost immediately after entering into the agreement, Dr. Hyman informed Mr. Purohit that he would effectively serve as CEO of all of the Hyman Companies. Despite the additional responsibilities, Mr. Purohit's already minimal CEO salary remained

8

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

unchanged, and Mr. Purohit was provided no equity in any of the other Hyman Companies. When Mr. Purohit expressed his concerns about this arrangement, Dr. Hyman assured him that they would find future opportunities where Mr. Purohit could increase his overall income.

34.    In reviewing the Hyman Companies, Mr. Purohit found a group of organizations that lacked focus and any meaningful (let alone profitable) presence in the online digital sales space, with their head (Dr. Hyman) overly focused on the book-publishing end of his business to the detriment of his other businesses and his personal brand.

35.    Mr. Purohit immediately began making significant changes, cleaning up operations and making sure that all aspects of the business were run professionally and transparently. He also shifted the focus of Dr. Hyman's business to digital and social media.

36.    The numbers speak for themselves: since Mr. Purohit took over the CEO position of Hyman Digital, Mr. Purohit grew Hyman Digital's revenue from $0 to $30 million dollars of gross revenue with $13 million of that comprising its net profits. By both total net profit and by profit margin, Mr. Purohit grew Hyman Digital to become the crown jewel amongst Dr. Hyman's business ventures.

## VI.    MR. PUROHIT'S PODCAST AND NEWSLETTER

### A.    The *Dhru Purohit Podcast*.

37.    In the Fall of 2017, HD produced an online documentary on brain health entitled *The Broken Brain*.

38.    In May of 2018, building on the same ideas set out in the documentary, Mr. Purohit launched a weekly podcast called the *Broken Brain Podcast*, which he hosted without any additional compensation. As the "on air talent," Mr. Purohit explored the human brain via interviews with scientists, doctors, and other professionals. The podcast never managed to

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

rejuvenate the "Broken Brain" line of content, and in March of 2021, HD stopped producing the *Broken Brain Podcast*.

39.     Mr. Purohit enjoyed podcasting, however, and so he decided to try launching his own personal podcast, on his own personal time, under the name *The Dhru Purohit Podcast*.  Video of *The Dhru Purohit Podcast* was distributed via Mr. Purohit's personal YouTube page, and he would discuss it on his own personal Instagram page.  Audio for the podcast was distributed through Mr. Purohit's own separate distribution accounts.  These accounts were all created by Mr. Purohit *prior* to his ever being affiliated with HD.

40.     During this time, Dr. Hyman already had a history of hosting content on his personal social media channels (particularly Instagram), which were not owned by HD, but which paid HD a 5% commission from their profits to manage the accounts.

41.     In March 2022, Mr. Purohit approached Dr. Hyman and proposed that the two carve out *The Dhru Purohit Podcast* in the same vein as the carve-outs for Dr. Hyman's personal social media accounts.  Specifically, that although *The Dhru Purohit Podcast*, its content, and its revenue, all belong to Mr. Purohit, he would agree to pay HD a 5% commission from its profits to help him manage the podcast.

42.     Dr. Hyman agreed to this arrangement, which they memorialized in an email chain with HD's Chief Financial Officer. (**Exhibit C**.)

43.     Between March 2022 and the end of 2023, the parties abided by the agreement, with HD assisting with *The Dhru Purohit Podcast*'s production and retaining 5% of the revenue.

**B.     The *Try This* Newsletter.**

44.     In July 2021, Mr. Purohit began an online newsletter called *Try This*. The

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

newsletter was made outside of work hours and allowed Mr. Purohit to write in his own voice on a variety of topics.

45.     Since its inception, *Try This* was set up on a third-party email host (MailChimp), which Mr. Purohit has personally paid for. Currently, the list has a modest 38,385 subscribers, and an archive of the newsletters and articles can be found on Mr. Purohit's *personal* website.[1]

46.     The only connection *Try This* has to HD is that Mr. Purohit requested from Dr. Hyman that HD help fund a writing position to assist Mr. Purohit with developing his writing skills. This request was discussed in April of 2021 and Dr. Hyman personally approved the hire.

47.     Even though this employee was technically hired by HD, their salary was 100% paid by revenue derived from Mr. Purohit's personal podcast (*The Dhru Purohit Podcast*).

48.     Both Dr. Hyman and HD were entirely aware of this arrangement because HD's Chief Financial Officer tracked all HD team time that went into *Try This* to maintain an accounting of exactly what was spent on it and made sure that all costs were initially covered by *The Dhru Purohit Podcast.*

49.     In approximately January 2022, in anticipation of *Try This* generating its own revenue, Mr. Purohit and Dr. Hyman agreed to treat *Try This* under the same 5% commission agreement as Dr. Hyman's personal Instagram account and *The Dhru Purohit Podcast.*

50.     In February 2022, *Try This* sold its first sponsorships and began paying HD its 5% commission.

---

[1] https://dhrupurohit.com/category/articles/

11

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

51.    *Try This*' revenue, commission payments, and disbursements were meticulously tracked by HD's Chief Financial Officer.

## VII.    DR. HYMAN'S INAPPROPRIATE BEHAVIOR, SELF-DEALING, AND INSENSITIVE AND UNFOUNDED MEDICAL CLAIMS HAVE RESULTED IN SEVERE HARM TO THE HD BRAND AND ITS BOTTOM LINE.

52.    By design, the Hyman Digital brand has remained inexorably linked to Dr. Hyman and his personal image and reputation.  Throughout its existence, Dr. Hyman has taken actions that have severally harmed that image and, as a result, harmed Hyman Digital's reputation.  These actions have resulted in opening Hyman Digital to legal claims and government investigations and have severally harmed both its growth and bottom line.

53.    This, in turn, has negatively affected the calculation used to calculate Mr. Purohit's buyout.

### A.    Dr. Hyman Controlled Hyman Digital

54.    HD was organized as a manager-managed LLC, with Dr. Hyman as both its supermajority member and its manager.  As such, although Mr. Purohit was HD's CEO, the two ran HD together, with Dr. Hyman fully aware of every aspect of the business and having final say as to its direction and operations.

55.    For example, Dr. Hyman was involved in making and approving content decisions that involve HD's name, appearance, or likeness.  As a result, Dr. Hyman has always been fully informed of how HD's resources were being used and how his content would be developed.

56.    Dr. Hyman also had sole access to HD's bank account and was intimately involved with the company's finances. Every month, Dr. Hyman would receive a detailed profit and loss statement on all of his businesses (including HD) and Mr. Purohit, Dr. Hyman,

12

and HD's Chief Financial Officer would hold regular hour-long meetings to review the financial health of all the Hyman Companies, including HD.

57.     Additionally, every week, HD's Chief Financial Officer would send Dr. Hyman a weekly breakdown of all ACH transfers needed, all checks needed to be approved, and all wire transfers needed to be made for all business owned by Dr. Hyman (including HD).  During Mr. Purohit's entire time as HD's CEO, Dr. Hyman retained sole authority to approve HD's financial transactions.

58.     While maintaining an iron grip on the Hyman Companies, Dr. Hyman consistently showed little interest in expending the time and energy needed to effectively run his businesses. He would regularly reschedule, be late for, or completely skip meetings that involved important budget conversations, prioritizing his personal and social calendar over the businesses.

**B.     Dr. Hyman Created A Hostile Work Environment in HD**

59.     As CEO, Mr. Purohit was made aware of numerous instances in which Dr. Hyman acted inappropriately with HD employees.  These include:

a.  Multiple occasions during which Dr. Hyman showed naked photographs of himself and his sexual partners to HD employees—including naked photographs of his ex-wife and later photographs of his girlfriend, Brianna Welsh, who Dr. Hyman would later marry and appoint as interim CEO of HD after Mr. Purohit's departure;

b.  Multiple occasions of HD female employees complaining about Dr. Hyman being overly physical and flirtatious with them, including inappropriate touching, rubbing thighs, touching lower back, touching upper buttocks,

13

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

referencing female's body parts during work conversations, and telling an employee that she was "hot"; and

c.  Multiple occasions of HD female employees complaining about Dr. Hyman comparing his body fat percentage to theirs, generally commenting on their bodies in a way that made them feel uncomfortable and disrespected, and engaging in similar fat-shaming behavior.

d.  Multiple requests made to an HD employee to purchase marijuana and to mail the marijuana to Dr. Hyman (which remains illegal to this day).

60.     To avoid these unwanted sexual discussions and advances, multiple female employees avoided being alone with Dr. Hyman.

61.     In an attempt to undo the damage to HD's culture and morale caused by Dr. Hyman's behavior, Mr. Purohit also took efforts to ensure that female employees were not required to be alone with Dr. Hyman, unsupervised.

62.     Mr. Purohit also spoke with Dr. Hyman on multiple occasions and impressed upon in him in no uncertain terms that any such behavior had to stop immediately and that Dr. Hyman needed to seek counseling to address his inappropriate behavior. Dr. Hyman's behavior was so inappropriate that his "life coach," unprompted by anyone at HD, also recommended that Dr. Hyman go on a 30-day "no-flirtation" challenge.

63.     Dr. Hyman's behavior lasted from 2015 to, at least, 2023.  On information and belief, the inappropriate behavior continues to this date.

**C.     Dr. Hyman's Questionable Tax Strategies Have Led To IRS Audits and Scrutiny.**

64.     Using questionable strategies, Dr. Hyman used his various companies to minimize his personal tax liabilities.

14

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

65. Some of these strategies border on the unethical and/or illegal. For example:

    a. Following the publication of his book, *Food Fix*, Dr. Hyman made multiple public statements promising to donate 100% of the proceeds from the book to the Food Fix Campaign, a 501(c)(3) non-profit entity committed to "Reforming public policies to dramatically improve human and environmental health." Despite these public statements, on information and belief, Dr. Hyman has refused to make the promised donations, instead choosing to line his own pockets with the profits from the book sales;

    b. Dr. Hyman employed a tax strategy called Captiv Insurance, where he would redirect profits from entities he solely owned and controlled into fake insurance entities so that he could falsely offset the revenue as "insurance payments" on those entities' tax returns; and

    c. Dr. Hyman would use businesses he solely owned and controlled to pay for his lavish lifestyle, including spending hundreds of thousands of dollars on home remodels, personal travel, and personal entertainment, falsely claiming these as "business expenses" on tax returns.

66. As a direct result of his tax "strategies", Dr. Hyman and his businesses have been, and currently are, the focus of multiple IRS audits.

67. Seeing Dr. Hyman's actions as antithetical to his duties as CEO and member of HD, Mr. Purohit prevented Dr. Hyman from implementing the same tax "strategies" at HD. However, Dr. Hyman's aggressive tax positions still came to negatively affect HD, as Dr. Hyman commandeered HD's CFO, as well as various other employees, to respond to the IRS investigations of his other companies.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

68.     HD has also personally been served with demands for financial information from the IRS and is constantly under the cloud of threats of active investigations.

**D.     Dr. Hyman's Exaggerated Medical Claims Have Harmed HD.**

69.     As part of its offering of products, HD produced numerous podcasts hosted by Dr. Hyman wherein he provided his audience medical education related to health, wellness, and food.  These included *House Call* and *The Doctor's Farmacy Podcast*.  HD's employees, including Mr. Purohit, would often encourage Dr. Hyman to present accurate facts and interpretation of nutritional research. However, as the only medical doctor at HD, and as the person responsible for approving the podcasts' content, HD relied on Dr. Hyman to provide evidence-based recommendations and assertions when discussing health, food, and wellness.

70.     Despite this, Dr. Hyman would repeatedly make claims without proper support or scientific backing. This resulted in a growing consensus among experts in the medical field, including Dr. Hyman's own colleagues, that Dr. Hyman's claims and advice are unsubstantiated and not backed by scientific evidence. This, in turn, resulted in many medical experts distancing themselves from Dr. Hyman.

71.     For example, Dr. Hyman previously served as the Director of the Center for Functional Medicine at the Cleveland Clinic. However, after repeatedly making hyper-sensational nutritional claims primarily to sell books and supplements, the Cleveland Clinic changed his title first to "Head of Strategy and Innovation" and later to "Senior Advisor." Employees at the Cleveland Clinic informed HD's staff, including Mr. Purohit, that they needed to distance themselves from Dr. Hyman to protect their brand.

72.     As another example, Dr. Hyman has previously aired several specials with PBS affiliates throughout the U.S.  Noting Dr. Hyman's propensity to make unsupported claims,

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

several PBS affiliates began requiring that Dr. Hyman run his scripts through their fact checker before recording content.

73.     As another example, several competing medical podcasts hosted episodes and brought in experts, devoted to specifically refuting Dr. Hyman's unsubstantiated claims.

74.     Rather than limit his public statements to medically-supported advice, Dr. Hyman blamed HD's employees for the scrutiny he received from the medical community. Dr. Hyman would also obsess over being excluded from other expert podcasts and constantly compared the size of his viewership to the viewership of competing medical podcasts. This obsession—which often led to outbursts and derailment of team meetings—was a direct hindrance to HD's employees' ability to perform their duties.

75.     All the while, Dr. Hyman continued to come under scrutiny and intense criticism for his views for claiming "calories do not matter," fat-shaming women, and for describing women with polycystic ovarian syndrome as "fat" "bearded ladies."

76.     These claims, and his stalwart refusal to admit to any wrongdoing, resulted in a withering of support for Dr. Hyman amongst the medical community and his peers and eroded trust not just in him, but in the HD brand—which is inexorably linked to his name and persona.

### E.     Dr. Hyman Used HD Resources For His Sole Benefit.

77.     While Mr. Purohit's success in establishing basic business governance over Hyman Digital had an immediate impact on bringing a sense of order to the chaos, Dr. Hyman continued to pose the biggest challenge to HD's success.

78.     Dr. Hyman treated HD's staff (including Mr. Purohit) as his personal staff and as interchangeable with the other Hyman Companies.  While more than half of all the Hyman

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Companies' employees work directly for HD, Dr. Hyman would regularly demand that those employees either work on his personal projects or on projects for his other Hyman Companies. This happened so frequently that employees would be required to include in their HD timesheets whether they were actually working for HD or for something else assigned to them by Dr. Hyman.  Examples of such activity include:

a. <u>Thrive Market</u>: One of the earliest examples of self-dealing was Dr. Hyman's instructions for HD to promote Thrive Market (an online grocer in which Dr. Hyman had invested). Mr. Purohit and the HD team were repeatedly instructed by Dr. Hyman to use Hyman Digital assets, including creating and sending multiple dedicated emails to HD's entire email list and posting numerous social media posts, in order to drive sales to Thrive Market. HD was not compensated for its services.  Instead, Dr. Hyman was personally granted equity in Thrive Market in exchange for HD's services. Dr. Hyman's equity was valued in 2015 at approximately $98,000. Today, as Thrive Market gears up for its initial public offering (IPO), Dr. Hyman's equity is worth millions of dollars. When Mr. Purohit objected to this arrangement, Dr. Hyman essentially stated that he was the majority owner of HD and that he could have HD work on whatever projects he wanted.

b. <u>Dr. Hyman's Books and Hyman Enterprises</u>: Hyman Enterprises is a separate company that is wholly owned by Dr. Hyman and focused exclusively on managing his books. Dr. Hyman insisted that HD's assets and resources (including email lists, social media, team time, and other resources) be used to promote his book launches every year. Once again,

18

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Dr. Hyman reaped 100% of the benefits of HD's work. When Mr. Purohit objected to this arrangement, Dr. Hyman reluctantly agreed to pay HD's hard costs—which effectively used HD resources without HD retaining any of the benefits.

c. <u>The Ultra Wellness Center</u>: The Ultra Wellness Center (the "Wellness Clinic") is a separate company that is wholly owned by Dr. Hyman. When Dr. Hyman's failure to focus on the Wellness Clinic led to its rapid decline, Dr. Hyman utilized HD resources, email lists, and personnel to advertise his clinic, ultimately to his great benefit. HD was once again not paid a penny for its services.[2] By contrast, HD's services resulted in the Wellness Clinic's gross revenues increasing from $4,296,852 in 2016 to $8,461,429 in 2022 and net profits increasing from $126,118 in 2016 to $845,416 in 2022.

d. <u>Mark's Picks</u>: Mark's Picks was a list built by the HD team to promote five things weekly that Dr. Hyman was enjoying. That list grew to over 300,000 subscribers who each received a sponsored ad alongside each weekly list. Although the Mark's Picks list is owned by HD, at Dr. Hyman's direction, the list was regularly used to promote Dr. Hyman's personal products and services, including his own wellness retreats. Once again, HD was not renumerated for these promotions.

---

[2]   While HD was eventually reimbursed for some of its employees' time spent on promoting the Wellness Clinic, since this was a straight reimbursement and did not cover all of its expenses, HD's efforts resulted in a net negative for itself and a net positive for the Wellness Clinic and Dr. Hyman personally.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

e. *The Broken Brain* Email Listserv: As part of the promotion for *The Broken Brain* documentary, HD created *The Broken Brain* email listserv which, at its height, had around 750,000 subscribers. As the documentary's buzz waned, Dr. Hyman started to use *The Broken Brain* email list to promote many of his own personal projects that had no direct benefit to HD, including his books. This email list was a key reason that Dr. Hyman's books were as successful as they were. Once again, HD was not renumerated for these promotions.

**F.     Dr. Hyman's Use of HD To Promote Function Health Presented the Last Straw and Led To Mr. Purohit Departure.**

79.     In the Fall of 2022, Dr. Hyman instructed Mr. Purohit that he intended to have HD enter into a partnership with Function Health—a company which performs advanced individualized lab testing—wherein HD would use its affiliates, email lists, and social media to promote the Function Health. Dr. Hyman once again insisted that HD not be paid for these services, but that he, Mr. Purohit, and Kaya Purohit (HD's then-Director of Content) would receive ownership shares in Function Health after a six-month period.

80.     Mr. Purohit was immediately against this deal. While a few individuals may benefit, the deal had absolutely no benefit to HD or its employees. It would also make it incredibly difficult for HD to take on the burden of promoting Function Health while maintaining its own products without increasing staff (which it could not afford as it was not being compensated by Function Health).

81.     It was then revealed that Dr. Hyman was actually a co-founder and co-owner of Function Health. This explained why he vehemently pushed for HD to provide considerable work for Function Health without any renumeration for HD. Despite Mr.

20

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Purohit arguing against the deal, Dr. Hyman, as HD's supermajority owner and manager, insisted and the deal was finalized in early 2023 (the "Function Health Agreement").

82.     The Function Health Agreement specifically limited the work HD was to perform.  This was vitally important to Mr. Purohit because any work done for Function Health effectively limited HD's resources and ability to conduct other work, without any added compensation which HD could have used to hire more employees or develop additional resources. Despite the agreement and Dr. Hyman's original assurances that HD's resources would not be abused to Function Health's benefit, Dr. Hyman quickly went back on his word and insisted that more and more of HD's resources be poured into supporting Function Health.

83.     The drain of resources became so bad that, in August 2023, Mr. Purohit called a meeting with Dr. Hyman to explain that HD could not continue to function if it was constantly forced to create extra-contractual content for Function Health.

84.     Ignoring this warning, Dr. Hyman made it clear that Function Health was his priority and insisted that Function Health's work be prioritized, even over work for HD's own branded content.

85.     Given that HD could not remain in a strong financial position with the Function Health portfolio weighing it down, and tired of Dr. Hyman's other problematic behavior, on September 12, 2023, Mr. Purohit informed Dr. Hyman that he would exit the company and his role as CEO—foregoing any equity in Function Health that he would otherwise have earned under the Function Health Agreement.

86.     Dr. Hyman accepted Mr. Purohit's resignation but requested that Mr. Purohit remain with HD through November 30, 2023 to assist the person Dr. Hyman had selected as interim acting CEO (Brianna Welsh—who was Dr. Hyman's girlfriend) with the transition.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Mr. Purohit agreed and, between September 12, 2023 and November 30, 2023, Mr. Purohit

continued to work for HD to facilitate the transition.

87.    After Mr. Purohit announced his decision, Dr. Hyman and Mr. Purohit

remained in close contact. On September 14, 2023, Dr. Hyman sent an email to Mr. Purohit

memorializing their discussion regarding Mr. Purohit's transition out of HD and expressing

"so much gratitude for all that" Mr. Purohit had done for him over the last eight years.

(**Exhibit D**, September 14, 2023 email.) In that email, Dr. Hyman explicitly recognized that

Mr. Purohit's departure would involve "carving out" *The Dhru Purohit Podcast* – a

recognition that it had always been owned by Mr. Purohit, and not HD, and that the two

would need to figure out whether HD would continue to assist Mr. Purohit in his production

of the podcast for the standard 5% commission.

88.    Under the HD Operating Agreement ("HD OA"), upon Mr. Purohit's voluntary

resignation as HD's CEO, HD was required to purchase his 20% minority membership

interest based on a set formula.  (**Exhibit B**, Article 9.4(a).)

89.    On October 16, 2023, Mr. Purohit requested that HD's Chief Financial Officer

provide the buyout number based on the formula outlined in the HD OA.  HD's Chief

Financial Officer responded with a buyout number of approximately $2,458,775.90.

90.    However, when it came time to finalizing the buyout, Dr. Hyman first became

non-responsive and then began making claims to ownership of *The Dhru Purohit Podcast* and

the *Try This* newsletter in an attempt to significantly reduce the buyout figure.  After nearly a

year of negotiations—during which Dr. Hyman hid behind ever-changing attorneys and

continuously promoted endlessly changing theories—it became clear that Dr. Hyman was

simply trying to avoid his contractual obligations.  Mr. Purohit has been forced to file this suit

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

both to enforce his own rights and on behalf of HD, which continues to employ over a dozen people and continues to suffer based on Dr. Hyman's ongoing actions.

> **G.  Dr. Hyman's Actions Continue a Pattern of Abusing His Business Relationships and Engaging in Risky Business Practices to Benefit His Personal Finances at the Expense of his Business Partners**

91.     This is not the first time that Dr. Hyman relied on others to build up his brand, save his company, then refused to pay them for their effort.

92.     Nor is this the first time that Dr. Hyman has created hostile work environments or acted in an unethical and illegal manner to benefit himself at the expense of his business partners.

93.     In August 2014, Dr. Hyman was sued by two former consultants he had previously hired to turn around Hyman Enterprises, which was struggling to stay afloat.

94.     According to the complaint filed in *Seibert, et al. v. Hyman Enterprises, LLC, et al.,* Dr. Hyman failed to pay hundreds of thousands of dollars in consulting fees accrued by Hyman Enterprises despite contractual obligations to do so.  (*See* **Exhibit E**).[3]

95.     Indeed, the accusations in the *Seibert* complaint largely mirror many of Mr. Purohit's own experiences.  For example, the *Seibert* complaint alleges:

> a.   That when Dr. Hyman hired the consultants to manage Hyman Enterprises, they found the company in utter disarray, lacking any effective leadership, and $2.9 million dollars in debt;
>
> b.   That Dr. Hyman improperly withdrew funds from Hyman Enterprises to pay for his personal expenses and to satisfy his alimony obligations

---

[3] The case was originally filed in New Jersey state court before Dr. Hyman and Hyman Digital removed it to the federal district court for the District of New Jersey.  *See* Case No. 3:14-cv-06435-FLW-DEA.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

stemming from his third divorce;

c. That Dr. Hyman repeatedly encouraged Hyman Enterprises employees to partake in the use of drugs (namely marijuana and ecstasy), including through a company party organized by Dr. Hyman called "Octoberfest";

d. That Dr. Hyman harassed and discriminated against certain Hyman Enterprises employees based on their religious background; and

e. That after the consultants stabilized Hyman Enterprises—resulting in a considerable financial benefit to Dr. Hyman—Dr. Hyman refused to pay for their services.

96.     The *Seibert* lawsuit was filed in mid-2014 and settled in March of 2015.  A few months later, Dr. Hyman repeated the same scam by partnering with Mr. Purohit, relying on Mr. Purohit to make his businesses profitable and tremendously benefitted from Mr. Purohit's efforts, only to refuse to pay Mr. Purohit his contractually agreed-upon compensation.  All the while, Dr. Hyman continued to harass his employees, self-deal, make wild and unsupported medical claims, body-shame his listeners, and evade his tax obligations.

<u>**FIRST CAUSE OF ACTION**</u>
**Breach of Contract: HD Operating Agreement – Failure to Purchase Membership**
**(Individually against Dr. Hyman and Hyman Digital, LLC)**

97.     Plaintiff incorporates all the above paragraphs as though fully set forth herein.

98.     Both Dr. Hyman and Mr. Purohit are members of HD and bound by the HD OA.

99.     Mr. Purohit was also the CEO of HD.

100.    Mr. Purohit has fully fulfilled his duties under the HD OA.

101.    Mr. Purohit submitted his resignation as CEO of HD on September 12, 2023.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

As of that date, Mr. Purohit owned 20% of HD, making him a "Minority Member" pursuant to the HD OA. (*See* **Exhibit B**, at p. 2.)

102.    Article 9.4(a) of the HD OA provides that in the event of the "the voluntary termination of employment by a Minority Member who is an employee (including the CEO) without cause, . . . the Company will purchase from such Member . . . and the Departing Member shall sell to the Company all of such Departing Member's Interests." (**Exhibit B**, Article 9.4(a).)

103.    Once Mr. Purohit terminated his employment with HD, the Company was obliged to purchase (and Mr. Purohit was obliged to sell) all of Mr. Purohit's equity interest in HD, according to the specific formula set forth in the HD OA.

104.    The purchase price of Mr. Purohit's "buyout" is calculated by taking his percentage interest in the company (20%) multiplied by the "Company Value" as of the date giving rise to the Termination Event (September 12, 2023) and then reducing the resulting number by 30%. (**Exhibit B**, Article 9.4(iv).)

105.    On October 16, 2023, Mr. Purohit requested that HD's Chief Financial Officer provide the buyout number based on the formula outlined in the HD OA.  HD's Chief Financial Officer responded with a buyout number of approximately $2,458,775.90.

106.    Under the HD OA, HD was to pay Mr. Purohit 25% of his buyout upfront and issue a non-negotiable promissory note for the remaining 75%, to be paid out over no more than three years.  (**Exhibit B**, Article 9.4(a)(i)-(iii).)

107.    Despite numerous demands by Mr. Purohit and his counsel, HD has refused to purchase Mr. Purohit's membership interest, refused to pay Mr. Purohit 25% of his buyout figure, and refused to issue the non-negotiable promissory note.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

108.    As a result of HD's refusal to adhere to the buyout provision of the HD OA,

Mr. Purohit has been damaged in an amount to be determined at trial, but no less than

$2,458,775.90, plus interest.

109.    Mr. Purohit is further entitled to injunctive or declaratory relief requiring that

HD issue the non-negotiable promissory note.

## SECOND CAUSE OF ACTION
### Breach of Contract: HD Operating Agreement – Failure to Make Distributions
### (Individually against Dr. Hyman and Hyman Digital, LLC)

110.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

111.    Article 6.3 of the HD OA requires that "all distributions", excepting certain

distributions not at issue here, "shall be distributed to the Members, pro rata in accordance

with their respective Percentage Interests."  (**Exhibit B**, Article 6.3.)

112.    On information and belief, Dr. Hyman distributed to himself a disproportionate

amount as compared to his 80% membership interest.

113.    In 2023, Mr. Purohit was only paid a total of $300,000 in distributions.

114.    Hyman Digital has failed to make the required distribution payment to Mr.

Purohit.

115.    As a result of HD's failure to adhere to Article 6.3 of the HD OA, Mr. Purohit

has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Individually Against Dr. Hyman and Hyman Digital, LLC)

116.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

117.    Implied in every contract is the obligation to act in good faith and fairly.

26

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

118.     Pursuant to the HD OA, Mr. Purohit was entitled to a buyout of his 20% membership interest over a period of three-years.

119.     At the time of Mr. Purohit's departure from HD, HD's revenues were more than sufficient to cover Mr. Purohit's required buyout over the 3-year period.

120.     Rather than maintain the operations of HD at sufficient levels to honor the buyout, or even set aside the necessary funds to make the required twenty-five percent initial payment, HD and Dr. Hyman devoted considerable resources to dispute Mr. Purohit's right to a buyout and then took steps to make the buyout nearly impossible.

121.     Specifically, Dr. Hyman appointed his then-girlfriend (now wife), Brianna Welsh, to replace Mr. Purohit as HD's CEO.  Dr. Hyman and Mrs. Welsh then proceeded to "clean house" by firing a large portion of HD's staff while at the same time taking multiple lavish vacations.  The result of this combination of self-sabotage and neglect is that, in less than a year since Mr. Purohit's departure, Dr. Hyman has taken a successful business to near bankruptcy.

122.      On information and belief, Dr. Hyman also used a considerable amount of HD's resources to wage his personal battle with Mr. Purohit.

123.     On information and belief, Dr. Hyman shifted HD resources and/or intellectual property to his other businesses in order to minimize HD's own revenue.

124.     As a result of HD and Dr. Hyman's breaches of the covenant of good faith and fair dealing, HD is on the brink of bankruptcy and Mr. Purohit's entire buyout is at risk.  Mr. Purohit therefore seeks an order holding Dr. Hyman responsible for said breach and for damages in an amount to be determined at trial, but no less than $2,458,775.90, plus interest.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Individually Against Dr. Hyman)

125.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

126.    Dr. Hyman is the 80% supermajority owner and managing member of HD.

(**Exhibit B** at p. 3.)

127.    Mr. Purohit is the 20% minority non-managing member of HD.

128.    As the 80% supermajority owner and managing member of HD, Dr. Hyman

owes Mr. Purohit a fiduciary duty of utmost good faith and loyalty.

129.    As described in greater detail above, Dr. Hyman breached his fiduciary duties

to Mr. Purohit in the following ways:

a.    Refusing to allow HD to buyout Mr. Purohit's membership interest, as
required under the HD OA;

b.    Taking out distributions from HD without providing Mr. Purohit a pro-
rata share of those distributions commensurate with his ownership
interest;

c.    Falsely claiming that HD has an ownership interest in *The Dhru
Purohit Podcast* and the *Try This* newsletter;

d.    Maintaining an iron grip of HD, while preventing it from making
meaningful and important decisions in a timeline fashion by regularly
skipping, being late for, or completely rescheduling meetings that
involved important budget conversations and prioritizing his personal
and social calendar over HD's business;

e.    Creating a hostile work environment wherein he showed naked

28

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

photographs of himself and his sexual partners (including HD's current

acting-CEO) to HD's employees;

f. Creating a hostile work environment by being overly physical with

HD's female employees;

g. Demanding that an HD employee buy him marijuana and mail it to

him;

h. Engaging in questionable tax strategies which ultimately resulted in the

use of HD's personnel and resources to respond to IRS demands and

put HD under greater IRS scrutiny;

i. Falsely claiming that 100% of the proceeds from his *Food Fix* book

would be donated to a 501(c)(3) charity;

j. Making unsupported and sensational claims using on HD's products,

including the claims that fat is healthy and that "calories do not matter";

k. Fat-shaming women and describing women with polycystic ovarian

syndrome as "fat" "bearded ladies";

l. Harming HD's brand by repeatedly making unsupported claims,

resulting in public criticism and a loss of respect within the medical

community;

m. Using HD's resources and personnel for his own personal gain and for

his own personal projects, without any compensation or benefits to HD,

including Thrive Market, Hyman Enterprises, Dr. Hyman's Wellness

Center, Mark's Picks, and Function Health; and

n. Insisting that more HD sources be devoted to Function Health, even

29

beyond what was required under HD's agreement with Function

Health.

130.    These actions resulted in direct and indirect harm to HD's reputation, ability to grow, and bottom line.  They have caused disruption among HD employees and have made HD vulnerable to private lawsuits and government investigations.

131.    In turn, this has directly harmed HD's revenue which, in turn, negatively affected the purchase price of Mr. Purohit's 20% membership interest in HD.

132.    Dr. Hyman's breaches have only continued since Mr. Purohit's departure.  Dr. Hyman appointed his then-girlfriend (now wife), Brianna Welsh, to replace Mr. Purohit as HD's CEO.  Dr. Hyman and Mrs. Welsh then proceeded to "clean house" by firing a large portion of HD's staff while at the same time taking multiple lavish vacations.  The result of this combination of self-sabotage and neglect is that, in less than a year since Mr. Purohit's departure, Dr. Hyman has taken a successful business—with more than sufficient revenue to buyout Mr. Purohit's 20% membership interest within the timeline specified in the HD OA— to near bankruptcy.

133.    On information and belief, Dr. Hyman also used a considerable amount of HD's resources to wage his personal battle with Mr. Purohit.

134.    On information and belief, Dr. Hyman shifted HD resources and/or intellectual property to his other businesses in order to minimize HD's own revenue.

135.    Dr. Hyman knowingly, intentionally, recklessly, or negligently breached his fiduciary duties.

136.    As a result of Dr. Hyman's conduct, Mr. Purohit's membership interest has been harmed and the value of his contractually-required buyout has been diminished.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Accordingly, Mr. Purohit is entitled to be restored to the position he reasonable expected, Dr. Hyman should be required to disgorge any profits he received from his self-dealing activities, should be required to pay HD for the harm caused by his breaches, and Mr. Purohit's buyout should be recalculated accordingly.

137.    If HD does declare bankruptcy due to Dr. Hyman's mismanagement, Mr. Purohit's entire buyout would become jeopardized, and Dr. Hyman should be held personally liable for the loss.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Derivatively Against Dr. Hyman)**

138.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

139.    Dr. Hyman is the 80% supermajority owner and managing member of HD. (**Exhibit B** at p. 3.)

140.    Mr. Purohit is the 20% minority non-managing member of HD.

141.    As the 80% supermajority owner and managing member of HD, Dr. Hyman owes HD a fiduciary duty of utmost good faith and loyalty.

142.    As described in greater detail above, Dr. Hyman breached his fiduciary duties to HD in the following ways:

    a.    Refusing to allow HD to buyout Mr. Purohit's membership interest, as required under the HD OA;

    b.    Taking out distributions from HD without providing Mr. Purohit a pro-rata share of those distributions commensurate with his ownership interest;

    c.    Falsely claiming that HD has an ownership interest in *The Dhru*

31

*Purohit Podcast* and the *Try This* newsletter;

d.      Maintaining an iron grip of HD, while preventing it from making meaningful and important decisions in a timeline fashion by regularly skipping, being late for, or completely rescheduling meetings that involved important budget conversations and prioritizing his personal and social calendar over HD's business;

e.      Creating a hostile work environment wherein he showed naked photographs of himself and his sexual partners (including HD's current acting-CEO) to HD's employees;

f.      Creating a hostile work environment by being overly physical with HD's female employees;

g.      Demanding that an HD employee buy him marijuana and mail it to him;

h.      Engaging in questionable tax strategies which ultimately resulted in the use of HD's personnel and resources to respond to IRS demands and put HD under greater IRS scrutiny;

i.      Falsely claiming that 100% of the proceeds from his *Food Fix* book would be donated to a 501(c)(3) charity;

j.      Making unsupported and sensational claims using on HD's products, including the claims that fat is healthy and that "calories do not matter";

k.      Fat-shaming women and describing women with polycystic ovarian syndrome as "fat" "bearded ladies";

l.      Harming HD's brand by repeatedly making unsupported claims,

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

resulting in public criticism and a loss of respect within the medical community;

m.  Using HD's resources and personnel for his own personal gain and for his own personal projects, without any compensation or benefits to HD, including Thrive Market, Hyman Enterprises, Dr. Hyman's Wellness Center, Mark's Picks, and Function Health; and

n.  Insisting that more HD sources be devoted to Function Health, even beyond what was required under HD's agreement with Function Health.

143.  These actions resulted in direct and indirect harm to HD's reputation, ability to grow, and bottom line. They have caused disruption among HD employees and have made HD vulnerable to private lawsuits and government investigations.

144.  Dr. Hyman's breaches have only continued since Mr. Purohit's departure. Dr. Hyman appointed his then-girlfriend (now wife), Brianna Welsh, to replace Mr. Purohit as HD's CEO. Dr. Hyman and Mrs. Welsh then proceeded to "clean house" by firing a large portion of HD's staff while at the same time taking multiple lavish vacations. The result of this combination of self-sabotage and neglect is that, in less than a year since Mr. Purohit's departure, Dr. Hyman has taken a successful business—with more than sufficient revenue to buyout Mr. Purohit's 20% membership interest within the timeline specified in the HD OA—to near bankruptcy.

145.  On information and belief, Dr. Hyman also used a considerable amount of HD's resources to wage his personal battle with Mr. Purohit.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

146. On information and belief, Dr. Hyman shifted HD resources and/or intellectual property to his other businesses in order to minimize HD's own revenue.

147. Dr. Hyman knowingly, intentionally, recklessly, or negligently breached his fiduciary duties.

148. As a result of Dr. Hyman's conduct, Dr. Hyman should be required to disgorge any profits he received from his self-dealing activities and should be required to pay HD for the harm caused by his breaches, in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Misappropriation of Corporate Opportunity**
**(Derivatively Against Dr. Hyman)**

149. Plaintiff incorporates all the above paragraphs as though fully set forth herein.

150. Dr. Hyman is the 80% supermajority owner and managing member of HD. (**Exhibit B** at p. 3.)

151. Mr. Purohit is the 20% minority non-managing member of HD.

152. As the 80% supermajority owner and managing member of HD, Dr. Hyman owes HD a duty not to misappropriate its corporate opportunities.

153. Dr. Hyman owns, or is otherwise involved in, several companies that could have relied on HD's services. Rather than allow HD to sell its services to these companies and profit from these sales, Dr. Hyman used his position as HD's 80% supermajority member and manager to force HD to provide these services for free. These actions were done knowingly and intentionally.

154. Dr. Hyman misappropriated, or usurped, HD's corporate opportunities by using resources and personnel for his own personal gain and for his own personal projects, without any compensation or benefits to HD, including Thrive Market, Hyman Enterprises,

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

Dr. Hyman's Wellness Center, Mark's Picks, and Function Health.

155.    These actions resulted in direct harm to HD's bottom line.

156.    In turn, this has directly harmed HD's revenue which, in turn, negatively affected the purchase price of Mr. Purohit's 20% membership interest in HD.

157.    A constructive trust should be created over the profit Dr. Hyman reaped for himself and his other enterprises based on this misappropriation and Dr. Hymans should be required to disgorge any profits he (or his entities) received from his misappropriation of HD's opportunities.

### SEVENTH CAUSE OF ACTION
**Declaratory Judgment – Authorship of Copyrights, 17 U.S.C. § 101 et seq.**
***The Dhru Purohit Podcast***
**(Individually Against HD)**

158.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

159.    Concurrently with his tenure as CEO of HD, Mr. Purohit independently conceived of and authored *The Dhru Purohit Podcast*.

160.    Mr. Purohit is informed and believes that HD claims authorship and ownership of the copyrights in *The Dhru Purohit Podcast* as works made for hire.

161.    Mr. Purohit contends that *The Dhru Purohit Podcast* is not a works-made-for-hire as Mr. Purohit conceived of and created *The Dhru Purohit Podcast* outside the scope of his employment as CEO of Hyman Digital. As such, Mr. Purohit is the rightful author of *The Dhru Purohit Podcast* and entitled to all attendant rights thereof, including the right to assign and/or transfer ownership of the copyrights.

162.    An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning Mr. Purohit's authorship of *The Dhru Purohit Podcast*.

163.    Mr. Purohit seeks a declaratory judgment as to authorship of the alleged

35

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

copyrights, specifically that Mr. Purohit is the author of *The Dhru Purohit Podcast* pursuant to the Copyright Act and entitled to all attendant rights thereof.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment – Authorship of Copyrights, 17 U.S.C. § 101 et seq.
### *Try This* Newsletter
### (Individually Against HD)

164.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

165.    Concurrently with his tenure as CEO of HD, Mr. Purohit independently conceived of and authored the *Try This* newsletter.

166.    Mr. Purohit is informed and believes that HD claims authorship and ownership of the copyright in the *Try This* newsletter as a work made for hire.

167.    Mr. Purohit contends that the *Try This* newsletter is not a work-made-for-hire, as Mr. Purohit conceived of and created the *Try This* newsletter outside the scope of his employment as CEO of Hyman Digital. As such, Mr. Purohit is the rightful author of the *Try This* newsletter and entitled to all attendant rights thereof, including the right to assign and/or transfer ownership of the copyright.

168.    An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning Mr. Purohit's authorship of the *Try This* newsletter.

169.    Mr. Purohit seeks a declaratory judgment as to authorship of the alleged copyright, specifically that Mr. Purohit is the author of the *Try This* newsletter pursuant to the Copyright Act and entitled to all attendant rights thereof.

## NINTH CAUSE OF ACTION
### Declaratory Judgment – Non-infringement of Trademarks, 15 U.S.C. § 1051 et seq.
### *The Dhru Purohit Podcast* and *The Dhru Purohit Show*
### (Individually Against HD)

170.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

171.  Concurrently with his tenure as CEO of HD, Mr. Purohit published the Podcasts under the title *The Dhru Purohit Podcast*.

172.  Starting on January 15, 2024, Mr. Purohit has published and intends to continue publishing podcasts and other content under the title *The Dhru Purohit Show*.

173.  HD has claimed ownership of, and rights to, the mark "*The Dhru Purohit Podcast*".

174.  HD has claimed that Mr. Purohit's continued use of *The Dhru Purohit Podcast* would constitute trademark infringement and has threatened to bring a lawsuit against Mr. Purohit on this basis.

175.  HD has also claimed that Mr. Purohit's use of marks similar to *The Dhru Purohit Podcast* would constitute trademark infringement and has threatened to bring a lawsuit against Mr. Purohit on this basis.

176.  An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning Mr. Purohit's right to distribute audiovisual and audio content under the marks *The Dhru Purohit Podcast* and *The Dhru Purohit Show*.

177.  Mr. Purohit seeks a declaratory judgment from this Court that his use of the marks *The Dhru Purohit Podcast* and *The Dhru Purohit Show* does not constitute trademark infringement.

### TENTH CAUSE OF ACTION
**Declaratory Judgment – Non-infringement of Trademarks, 15 U.S.C. § 1051 et seq.**
***Try This* Newsletter**
**(Individually Against HD)**

178.  Plaintiff incorporates all the above paragraphs as though fully set forth herein.

179.  Concurrently with his tenure as CEO of HD, Mr. Purohit published the *Try This* newsletter.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

180.     After his departure from HD, Mr. Purohit has published and intends to continue publishing the *Try This* newsletter.

181.     HD has claimed ownership of, and rights to, the mark "*Try This*."

182.     HD has claimed that Mr. Purohit's continued use of *"Try This"* would constitute trademark infringement and has threatened to bring a lawsuit against Mr. Purohit on this basis.

183.     HD has also claimed that Mr. Purohit's use of marks similar to *"Try This"* would constitute trademark infringement and has threatened to bring a lawsuit against Mr. Purohit on this basis.

184.     An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning Mr. Purohit's right to distribute written content under the mark *"Try This"*.

185.     Mr. Purohit seeks a declaratory judgment from this Court that his use of the mark *"Try This"* does not constitute trademark infringement.

### ELEVENTH CAUSE OF ACTION
**Declaratory Relief – *The Dhru Purohit Podcast***

186.     Plaintiff incorporates all the above paragraphs as though fully set forth herein.

187.     An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning their rights and obligations under the Executive Services Agreement.

188.     HD has claimed that it is the rightful owner of *The Dhru Purohit Podcast*, that Mr. Purohit's continued use and publication of *The Dhru Purohit Podcast* constitutes a breach of the ESA and has threatened to bring a lawsuit against Mr. Purohit on that basis.

189.     Mr. Purohit denies HD's claims: he is the rightful owner of the *Dhru Purohit Podcast*. He further denies that the continued use and distribution of *The Dhru Purohit*

38

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

*Podcast* constitutes a breach of the ESA.

190.    At no time did Mr. Purohit transfer, assign, or otherwise grant title or ownership right to *The Dhru Purohit Podcast* to HD or anyone else, including by way of the Executive Services Agreement.

191.    Mr. Purohit seeks declaratory judgment from the Court that he is the rightful and exclusive owner of *The Dhru Purohit Podcast*.

192.    Mr. Purohit further seeks declaratory judgment from the Court that his creation and use of *The Dhru Purohit Podcast* is not a violation of his ESA.

**TWELTH CAUSE OF ACTION**
**Declaratory Relief – *Try This* Newsletter**

193.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

194.    An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning their rights and obligations under the Executive Services Agreement.

195.    HD has claimed that it is the rightful owner of the *Try This* newsletter, that Plaintiff's continued use and publication of the *Try This* newsletter and use and possession of the subscriber list, constitutes a breach of the ESA and has threatened to bring a lawsuit against Mr. Purohit on that basis.

196.    Mr. Purohit denies HD's claims: he is the rightful owner of the *Try This* newsletter, which he started on his own time for the purpose of writing in his own voice – not for HD's benefit.  He further denies that the continued use and publication of the *Try This* newsletter and use and possession of the subscriber list, constitutes a breach of the ESA.

197.    At no time did Mr. Purohit transfer, assign, or otherwise grant title or ownership right to the *Try This* newsletter to HD or anyone else, including by way of the Executive Services Agreement.

39

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

198.     Mr. Purohit seeks declaratory judgment from the Court that he is the rightful

and exclusive owner of the *Try This* newsletter and the associated subscriber list.

199.     Mr. Purohit further seeks declaratory judgment from the Court that his creation

and use of the *Try This* newsletter is not a violation of his ESA.

### THIRTEENTH CAUSE OF ACTION
**Declaratory Judgment – Ownership of YouTube, Instagram, Spotify, Apple, Facebook, X (formerly Twitter), and TikTok Accounts (collectively, the "Social Media Accounts") (Individually Against HD)**

200.     Plaintiff incorporates all the above paragraphs as though fully set forth herein.

201.     Mr. Purohit created the YouTube channel, www.youtube.com/@dhrupurohit,

in 2012—years before he was hired as CEO of HD and years prior to HD's very existence.

202.     Mr. Purohit created the Instagram account, @dhrupurohit, in 2012—years

before he was hired as CEO of HD and years prior to HD's very existence.

203.     Mr. Purohit created the Apple account, in his own name, in August 2017.

204.     Mr. Purohit created his personal and business Facebook accounts, which are

both under his own name, in 2012—years before he was hired as CEO of HD and years prior

to HD's very existence.

205.     Mr. Purohit created his Twitter account (now known as X), "@dhrupurohit", in

2006—years before he was hired as CEO of HD and years prior to HD's very existence.

206.     Mr. Purohit created the Spotify account, under his own name, in 2012—years

before he was hired as CEO of HD and years prior to HD's very existence.

207.     Mr. Purohit created the TikTok account, @Dhru.Purohit, in March 2022.

TikTok first launched in 2016 and therefore did not exist prior to HD's founding.

208.     Together, the YouTube account, Instagram account, Apple account, Facebook

accounts, Twitter (or X) account, Spotify account, and TikTok accounts shall be collectively

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

referred to as the "Social Medial Accounts".

209.    An actual, present, and justiciable controversy has arisen between HD and Mr. Purohit concerning the ownership of the Social Media Accounts.

210.    HD has claimed that it is the rightful owner of the Social Media Accounts and/or that Plaintiff's continued use and possession of the Social Media Accounts constitutes a breach of the ESA and has threatened to bring a lawsuit against Mr. Purohit on that basis.

211.    Mr. Purohit has always maintained exclusive control over the Social Media Accounts.

212.    Mr. Purohit independently created the Social Media Accounts, the names of each account starkly identify them as being the account of Mr. Purohit, each Social Media Account has been exclusively maintained and used to promote Mr. Purohit's brand independently and separately from HD with Dr. Hyman's full knowledge and consent.

213.    At no time did Mr. Purohit transfer, assign, or otherwise grant title or ownership right to the Social Media Accounts to HD or anyone else, including by way of the Executive Services Agreement.

214.    Mr. Purohit seeks declaratory judgment from the Court that he is the rightful and exclusive owner of the Social Media Accounts.

215.    Mr. Purohit further seeks declaratory judgment from the Court that his creation and use of the Social Media Accounts is not a violation of his ESA.

## **PRAYER FOR RELIEF**

WHERFORE, Mr. Purohit respectfully requests the following relief:

A.    Judgment in Mr. Purohit's favor and against all Defendants on all causes of action alleged herein;

41

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

B.    An order against HD awarding Mr. Purohit his full buyout in an amount to be determined at trial, but no less than $2,458,775.90, plus interest.

C.    Declaratory or injunctive relief requiring HD to issue Mr. Purohit a non-negotiable promissory note, as required under the HD OA.  (**Exhibit B**, Article 9.4(a)(i)-(iii).)

D.    An order against HD awarding Mr. Purohit his mandated distributions in an amount to be determined at trial, plus interest.

E.    An order against Dr. Hyman awarding Mr. Purohit his full buyout in an amount to be determined at trial, but no less than $2,458,775.90, plus interest.

F.    An order requiring Dr. Hyman to disgorge to HD any profits he, or his entities, received from his self-dealing activities, in an amount to be determined at trial.

G.    An order requiring Dr. Hyman to compensate Mr. Purohit and HD for his breaches of his fiduciary duties, in an amount to be determined at trial.

H.    A constructive trust to be created over the profit Dr. Hyman reaped for himself and his other enterprises based on his misappropriation of HD's corporate opportunities.

I.    A declaratory judgment that Mr. Purohit is the author and owner of *The Dhru Purohit Podcast* pursuant to the Copyright Act and entitled to all attendant rights thereof.

J.    A declaratory judgment that Mr. Purohit is the author and owner of the *Try This* newsletter pursuant to the Copyright Act and entitled to all attendant rights thereof.

K.    A declaratory judgment that Mr. Purohit's use of the marks *The Dhru Purohit*

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

*Podcast* and *The Dhru Purohit Show* does not constitute trademark infringement.

L.   A declaratory judgment that Mr. Purohit's use of the *"Try This"* mark does not constitute trademark infringement.

M.   A declaratory judgment that Mr. Purohit is the rightful and exclusive owner of the *Try This* newsletter and the associated subscriber list.

N.   A declaratory judgment that Mr. Purohit's creation and use of the *Try This* newsletter is not a violation of his ESA.

O.   A declaratory judgment that Mr. Purohit is the rightful and exclusive owner of *The Dhru Purohit Podcast*.

P.   A declaratory judgment that Mr. Purohit's creation and use of *The Dhru Purohit Podcast* is not a violation of his ESA.

Q.   A declaratory judgment that Mr. Purohit is the rightful and exclusive owner of the Social Media Accounts.

R.   A declaratory judgment that Mr. Purohit's creation and use of the Social Media Accounts is not a violation of his ESA.

S.   For any other damages in an amount to be proven at trial;

T.   For punitive damages, to the extent allowed;

U.   For attorneys' fees and costs as permitted by applicable law or agreement;

V.   For any and all other relief to which Mr. Purohit, individually and derivatively on behalf of HD, may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Respectfully submitted,

DHRUMIL PUROHIT,

By his attorneys,

/s/ Dillon M. Knight
Christopher J. Marino, BBO# 655007
Dillon M. Knight | BBO# 703573
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place, 37th Floor
Boston, MA 02108
Telephone: 617-367-2500
cmarino@davismalm.com
dknight@davismalm.com

* /s/ Denis Shmidt
*Denis Shmidt, Esq. SBN# 267987
*Nabil Bisharat, Esq. | SBN# 270305
*Jennifer haidar, Esq. | SBN # 337558
ORSUS GATE LLP
16 N. Marengo Avenue, Suite 505
Pasadena, CA 91101
Telephone: 415-326-3558
dshmidt@orsusgate.com
nbisharat@orsusgate.com
jhaidar@orsusgate.com
[*pro hac vice admission pending]

Dated: July 11, 2024

Doc ID: 83eb34c5abb551f7372399466f64e7d51be27f51