# EXHIBIT E

ORSUS GATE LLP
Denis Shmidt (Bar No. 267987)
Nabil Bisharat (Bar No. 270305)
Jennifer Haidar (Bar No. 337558)

16 N. Marengo Ave., Suite 505
Pasadena, CA 91101
Telephone: (415) 326-3558
Email: DShmidt@OrsusGate.com
Email: NBisharat@OrsusGate.com
Email: JHaidar@OrsusGate.com

*Attorneys for Claimants Dhrumil Purohit
and Farmacy LLC*

JAMS ARBITRATION

| | |
|---|---|
| DHRUMIL PUROHIT, an individual, and FARMACY LLC, a Massachusetts limited liability company<br><br>               Claimants,<br><br>  v.<br><br>MARK HYMAN, an individual,<br><br>               Respondent. | JAMS Reference No.<br><br>**DEMAND FOR:**<br><br>**(1)  Breach of Written Contract;**<br>**(2)  Breach of Fiduciary Duty;**<br>**(3)  Breach of Implied Covenant of Good Faith & Fair Dealing (Operating Agreement);**<br>**(4)  Unjust Enrichment / Restitution;**<br>**(5)  Conversion; and**<br>**(6)  Theft by False Pretenses (Cal. PC § 496).** |

Claimants Dhrumil "Dhru" Purohit ("Mr. Purohit") and Farmacy LLC ("Farmacy") (collectively, "Claimants") bring this arbitration against Respondent Dr. Mark Hyman ("Dr. Hyman" or "Respondent"), and allege as follows:

## INTRODUCTION

1.     In 2019, Mr. Purohit and Dr. Hyman created Farmacy LLC, a company which markets and distributes health and wellness products.

2.     At all times relevant to this dispute, Mr. Purohit and Dr. Hyman were Farmacy's sole members, each owning a 50% equity stake.

3.     Pursuant to the Farmacy Operating Agreement ("Operating Agreement") (attached as **Exhibit A**), Mr. Purohit is, and has always been, Farmacy's sole Manager.

4.     Starting in 2023 and continuing through the present, Dr. Hyman engaged in multiple violations of the Farmacy Operating Agreement as well as his fiduciary duties as a member of Farmacy.  These include (1) joining the board of a competitor and promoting its products, which directly competed with Farmacy and its products; (2) unilaterally and improperly firing Farmacy's primary employee, Darci Gross; (3) hiring his wife, Mrs. Hyman (formerly Ms. Welsh), to replace Ms. Gross; (4) collaborating with Mrs. Hyman to improperly remove Mr. Purohit's access to Farmacy's bank and vendor accounts; (5) failing to fulfill necessary stock orders, which created impermissible delays that harmed the company's sales; (6) preventing Farmacy from paying its own legal counsel; and (7) making distributions to himself while preventing Mr. Purohit from receiving the same distributions.

5.     As a direct result of Dr. Hyman's actions, Mr. Purohit has been prevented from exercising his managerial duties in violation of the Operating Agreement and both Claimants have been damaged in an amount to be determined in arbitration, including but not limited to, attorneys' fees, costs and interest.

## THE PARTIES

6.     Claimant Dhru Purohit is a California resident living in Los Angeles, California.  Mr. Purohit is a 50% owner of Farmacy.

7.      Claimant Farmacy LLC is a limited liability company incorporated in the

Commonwealth of Massachusetts with its principal place of business in Lenox, Massachusetts.

8.      On information and belief, respondent Dr. Mark Hyman is a Massachusetts

resident living in Berkshire County.

## JURISDICTION AND VENUE

9.      JAMS has jurisdiction over this dispute pursuant to paragraph 15.8 of the Farmacy

Operating Agreement.

10.     Los Angeles County is the proper venue for this dispute pursuant to paragraph 15.8

of the Farmacy Operating Agreement.

## FACTUAL ALLEGATIONS

**I.      The Partnership Starts, and Farmacy is Formed**

11.     Mr. Purohit and Dr. Hyman first met through mutual friends in 2009.  They

quickly found common ground: at that time, Mr. Purohit was already a successful CEO at Clean

Program, a company which made and sold vitamins in collaboration with a New York-based

cardiologist, and Dr. Hyman was a medical doctor practicing in the functional health space who

was primarily focused on publishing his diet books and running small group programs and using

his email lists to promote partner products and content.

12.     Shortly after meeting each other, Dr. Hyman sought out Mr. Purohit to seek

business advice as Mr. Purohit was, at the time, an established leader in developing companies in

the health and wellness industry.  In particular, Dr. Hyman reached out to Mr. Purohit to discuss

solutions and advice to help grow his business in light of Mr. Purohit's success with Clean

Program.

13.     From their first meeting in 2009 through 2015, Mr. Purohit would occasionally

provide Dr. Hyman with business advice and mentorship.  Despite Dr. Hyman's offers to Mr.

Purohit requesting that Mr. Purohit join his team, the two remained in contact but not in business.

14.     In March of 2015, Mr. Purohit made the decision to leave Clean Program to seek

another venture, and following yet another offer from Dr. Hyman, decided to help Dr. Hyman

revitalize his business.

15.     Initially, Mr. Purohit only agreed to assist Dr. Hyman in a limited capacity as a consultant, but shortly thereafter, in July of 2015, Dr. Hyman asked that Mr. Purohit join as an equity partner in Hyman Digital, LLC ("HD"), a company that was formed to help promote Dr. Hyman in the online and social media spaces.

16.     Prior to Mr. Purohit's influence, Dr. Hyman lacked any significant social media presence and relied on Dr. Hyman's wellness books and email lists for marketing.

17.     Mr. Purohit, as CEO of HD, made significant changes by shifting HD's focus solely from Dr. Hyman's books to digital and social media.

18.     Under Mr. Purohit's tenure, HD's revenue grew to $30 million dollars in gross revenue, with $13 million of that comprising net profits.

19.     Meanwhile, as Mr. Purohit successfully transformed Dr. Hyman's business enterprises in his capacity as CEO of HD, he and Dr. Hyman decided to launch another business: Farmacy.

20.     This time, the two men agreed to an equal 50/50 ownership in the venture, with Dr. Hyman lending his credibility as a doctor and Mr. Purohit providing the managerial expertise that had made HD into the success that it was.

21.     Farmacy was founded on November 21, 2019, with both Mr. Purohit and Dr. Hyman as its only two members, but with Mr. Purohit as Farmacy's sole Manager.  (Exh. A at pg. 4.)

22.     As Manager of Farmacy, Mr. Purohit has the "discretion to manage and control the business and affairs of the Company, to make decisions affecting the business and affairs of the Company and to take such actions as the Manager deems necessary or appropriate to accomplish the purposes of the Company."  (Exh. A ¶ 7.1.)

**II.     Farmacy Becomes Part of the Larger Dispute Between Dr. Hyman and Mr. Purohit**

23.     Despite their success, the relationship between the two men reached an impasse in 2023 after Mr. Purohit decided to move on from HD.  While initially amicable, Dr. Hyman and HD's refusal to honor their contractual obligations to Mr. Purohit, as well as a host of other issues, resulted in over six months of unsuccessful negotiations, followed by a lawsuit filed by

1   Mr. Purohit against Dr. Hyman and HD in United State District Court for the District of

2   Massachusetts (Case No. 1:24-cv-11784) (the "HD Litigation").

3       24.     As amicable discussions about his departure devolved into accusations and Dr.

4   Hyman's breaches of their agreements, it became clear to Mr. Purohit that he would no longer be

5   able to continue working with Dr. Hyman in any capacity – including Farmacy.

6       25.     Mr. Purohit presented Dr. Hyman with several options to address Farmacy,

7   including: a buyout from either member, a third-party sale of Farmacy, or a wind-down pursuant

8   to Farmacy's Operating Agreement.  At every step, Mr. Purohit explained that a neutral

9   evaluation of Farmacy was needed in order for both men to understand the value of their

10  respective ownership shares in Farmacy.

11      26.     In response, Dr. Hyman spent months refusing to actively engage in discussions

12  over Farmacy, including ignoring Mr. Purohit's formal written request to further mediate their

13  dispute over Farmacy.[1]

14      27.     When it finally became clear to Dr. Hyman that Farmacy could not be ignored, he

15  relented and agreed to have the company valued so that its resolution could be part of the greater

16  settlement between the two men.

17      28.     Farmacy hired Nesenoff & Miltenberg LLP ("N&M") to act as neutral, objective,

18  and impartial counsel for Farmacy tasked with overseeing the valuation process for the possible

19  wind-down, dissolution and/or sale of Farmacy's assets.

20      29.     In December 2023, N&M began to interview valuation experts and began the

21  valuation process.

22      30.     Dr. Hyman was fully aware of N&M's mandate and his attorneys were kept

23  informed of N&M progress.

24      31.     During this same time period, given the many improper actions carried out by Dr.

25  Hyman in his other businesses (including in HD), Farmacy conducted an investigation into Dr.

26  Hyman's actions as a member.

27

28  [1] Dr. Hyman and Mr. Purohit did attend a full-day mediation session with JAMS on October 16,
    2023 to try and resolve their differences over HD and Farmacy, which was unsuccessful.

32.     This investigation revealed that Dr. Hyman was then, and still remains, in breach of the Operating Agreement, as well as in violation of his various fiduciary duties to Farmacy.

**III.     The Gut Food Re-Order**

33.     On December 5, 2023, Farmacy's then-Director of Operations, Darci Gross ("Ms. Gross") informed Mr. Purohit and Dr. Hyman that Farmacy would need to re-order inventory for Gut Food (one of Farmacy's products) from its manufacturer in order to reduce any upcoming gaps in inventory.

34.     Gut Food orders required advance notice, as this product line usually resulted in a several-month turnaround time to manufacture and distribute.

35.     Ms. Gross made this request at a time when the supply of inventory from Gut Food was estimated to run out in April of 2024, failing approval of a restock.

36.     Dr. Hyman's initial reaction was to reject this request, incorrectly claiming that they would soon be dissolving Farmacy and expressly reminding Mr. Purohit that Mr. Hyman's approval was "required for any expenditures over $50,000" pursuant to the Farmacy Operating Agreement.

37.     No such agreement had been reached to dissolve Farmacy.  On the contrary, Dr. Hyman and his representatives studiously avoided making any decision as to Farmacy's fate.

38.     In order to maintain Farmacy's status quo during the pendency of the valuation, Mr. Purohit pushed back on Dr. Hyman's rejection and reminded Dr. Hyman that the future of Farmacy was, at that point, uncertain.

39.     Indeed, N&M advised Dr. Hyman in writing that Farmacy should continue to operate as normal and that the parties should not make any dramatic changes as, "any attempt to not maintain status quo could be seen by either party as a true breach in fiduciary duty."

40.     Nonetheless, Dr. Hyman continued to delay for over a month and waited until January 11, 2024 to finally deliver his approval of the Gut Food re-order.

41.     This delay resulted in Farmacy being out of stock of Gut Food from May 25, 2024 through June 30, 2024—costing the company hundreds of thousands of dollars and further harming Farmacy with its customer base.

42.     Despite this, at Dr. Hyman's direction, Farmacy continued to list the products as available on its website and allowed customers to purchase products that Farmacy did not possess and without a clean timetable of when they would become available.

43.     This harmed Farmacy's profitability, its reputation, and exposed Farmacy to potential Federal and Trade Commission ("FTC") actions and/or violations.

**IV.    The Seed Partnership**

44.     On January 12, 2024, Dr. Hyman publicly announced that he had partnered with Seed Health ("Seed") to promote DS-01.  This product is a probiotic that directly competes with Farmacy's own products.

45.     In his communications, Dr. Hyman told his followers on social media, and via email, that he would be joining Seed's board and recommended DS-01 as "the probiotic [he] use[s] daily, recommend[s] and wholeheartedly endorse[s] as a genuine game-changer."

46.     Dr. Hyman's email endorsing DS-01 identified it as his "favorite" probiotic and was focused entirely on Seed.  This was a considerable departure from his usual communication to his listserv, which normally offered general information on a broader topic, such as sleep or healthy eating.

47.     Dr. Hyman never sought Mr. Purohit's consent before accepting his appointment to Seed's board, as required under the Farmacy Operating Agreement. (*See* Exh. A ¶ 14.1(c).)

48.     As a result of Dr. Hyman's announcement and promotion of DS-01, Farmacy's customers immediately responded with general confusion and concern.

49.     For example, customers responded on social media asking, "[w]hat about Gut Food? You're no longer involved with that product?" and "[a]re we puppets??", among other cries of outrage and uncertainty.

50.     On February 09, 2024, Farmacy demanded that Dr. Hyman immediately discontinue his involvement with Seed and take steps to repair the resulting decline of customer confidence in Farmacy.

51.     On February 19, 2024, Dr. Hyman (through counsel) essentially admitted to his wrongdoing by confirming that he would refrain from marketing or promoting Seed and that he

1    had withdrawn from Seed's advisory board effective immediately.

2        52.    Despite this admission, Dr. Hyman's posts promoting DS-01 remain up and Dr.

3    Hyman has done nothing to respond to consumer questions or to rehabilitate Farmacy's own

4    products within the minds of Dr. Hyman's followers.

5        53.    At the same time, Dr. Hyman has de-emphasized his promotion of Gut Health by

6    removing it from the forefront of his own website and hiding it among a list of multiple other

7    products unrelated to Farmacy while continuing to emphasize his promotion of DS-01 by placing

8    it on the front page of his website and identifying it as a "top supplement".

9    **V.    Dr. Hyman's Forestalls Claims From Farmacy By Pretending To Enter Into Good**

10       **Faith Settlement Discussions**

11       54.    Upon learning of Dr. Hyman various breaches, Farmacy retained Vinson & Elkins

12   LLP ("V&E") to act as its litigation counsel.  Letters were exchanged between V&E and Dr.

13   Hyman's counsel on February 9 and 19, 2024.

14       55.    On February 21, 2024, Mr. Purohit's counsel sent Dr. Hyman a comprehensive

15   global settlement offer with the option to have Dr. Hyman purchase Mr. Purohit's equity interest

16   in Farmacy.

17       56.    On around February 29, 2024, Dr. Hyman's former counsel confirmed Dr.

18   Hyman's agreement to the global settlement offer, including the option to purchase Mr. Purohit's

19   interest in Farmacy.

20       57.    With an agreement in principle in place, work began on a global settlement

21   agreement for both Farmacy and HD, among other entities. At Dr. Hyman's request and believing

22   that a settlement was imminent, in March 2024, Farmacy agreed to halt the valuation and

23   instructed its litigation counsel to pause any enforcement efforts related to Dr. Hyman's various

24   breaches.

25   **VI.   Dr. Hyman Uses the Global Settlement Discussions As A Way To Consolidate**

26        **Control Over Farmacy and Pay Himself, While Withholding Contractually Owed**

27        **Funds to Mr. Purohit and Preventing Farmacy From Paying Its Vendors**

28       58.    During the pendency of these global settlement negotiations—which contemplated

Dr. Hyman buying out Mr. Purohit's interest in Farmacy and becoming Farmacy's sole member—Dr. Hyman took several actions to consolidate his control over Farmacy: including unilaterally terminating Ms. Gross (Farmacy's primary employee) and locking Mr. Purohit out of Farmacy's bank and vendor accounts.

59.    Upon learning that Ms. Gross had been terminated, and after receiving an inquiry from a Farmacy vendor as to who would take over for Ms. Gross, on March 19, 2024, Mr. Purohit (through counsel) sent an email to Dr. Hyman, identifying the issues with Ms. Gross' termination, reiterating that he was still Farmacy's Manager, and demanding that Dr. Hyman authorize the re-hiring of Ms. Gross or that Dr. Hyman appoint someone else to manage Farmacy's operations while the global settlement negotiations remained pending.

60.    Dr. Hyman's counsel responded on March 20, 2024, stating: "Given the imminence of settlement, [Dr. Hyman] thinks the most logical option would be to use existing staffing to meet Farmacy's business needs rather than start a new employment contract before the settlement is finalized."

61.    Trusting that Dr. Hyman was negotiating in good faith and that a global settlement was, in fact, imminent, Mr. Purohit acquiesced to Dr. Hyman's request.

62.    However, instead of appointing someone qualified to replace Ms. Gross, Dr. Hyman gave the job to his wife, Mrs. Hyman (formerly Ms. Welsh).

63.    Mr. Purohit did not approve of this decision, but because Dr. Hyman's acquisition of Farmacy was a longstanding component of the parties' global settlement agreement, Mr. Purohit did not immediately contest this decision in the belief that the settlement was imminent and that he would soon no longer be a member of Farmacy.  This belief, in the good faith nature of Dr. Hyman's negotiations, would prove to be misplaced.

64.    Upon taking over Farmacy's operations, Dr. and Mrs. Hyman failed to reorder any product, failed to send out a single advertisement to Farmacy's significant listserv, and failed to maintain the proper customer support apparatus.

65.    Ms. Gross' dismissal also allowed Dr. Hyman to effectively remove Mr. Purohit's access to various Farmacy vendors.  Ms. Gross was a shared employee between Farmacy and HD.

However, her primary email address was through HD.  As Farmacy's former Director of Operations, many of Farmacy's vendor accounts were registered by Ms. Gross through her HD email address. Several vendor accounts also shared login credentials with HD's accounts. When Dr. Hyman terminated Ms. Gross from both HD and Farmacy, she lost access to her HD email address—which remained in Dr. Hyman's control.  Using this control, and the login credentials Ms. Gross provided upon her departure, Dr. Hyman was able to effectively block Mr. Purohit from accessing Farmacy's vendor accounts.

66.    Dr. Hyman was also able to use the intermingling between HD and Farmacy to restrict Mr. Purohit's access to Farmacy's bank account.  While Farmacy has always maintained its own bank account, it was initially setup in a way that any checks issued by Farmacy's bank account required written approval from HD's Chief Financial Officer.

67.    In essence, this created a system where Dr. Hyman could override any expenditure made by Farmacy. A system that Dr. Hyman abused to Farmacy and Mr. Purohit's detriment.

68.    Specifically, when Farmacy hired V&E as its outside counsel, the firm requested a standard retainer.  Dr. Hyman used his control over Farmacy's bank account to prevent Farmacy from paying V&E, despite the fact that the amount of V&E's retainer was below the $50,000 threshold which would otherwise have required Dr. Hyman's consent.  [Exh. A ¶ 7.5(a)(vii)].

69.    Additionally, pursuant to section 6.1 of Farmacy's Operating Agreement, "[n]et profits and net losses for each Fiscal Year shall be allocated to each Member in accordance with the Member's Percentage Interest." [Exh. A ¶ 6.1].

70.    Because Dr. Hyman and Mr. Purohit have an equal 50/50 membership percentage interest in Farmacy, their distributions from Farmacy should have been equal as well.

71.    Ignoring this requirement, between January 9, 2024 and July 9, 2024, Dr. Hyman withdrew a total of $93,800 from Farmacy.  During the same time period, Mr. Purohit was only able to withdraw $10,000.  His attempts to make any further withdrawals were blocked by Dr. Hyman.

**VII.    After Months of Negotiations, Dr. Hyman Reneges on the Settlement Agreement, Yet Prevents Mr. Purohit From Resuming His Managerial Role**

72.    After months of negotiations, Dr. Hyman's disingenuous attitude towards the settlement discussions became apparent. On June 26, 2024, Mr. Purohit's counsel informed Dr. Hyman's counsel that if a settlement was not reached by July 11, 2024, (1) Mr. Purohit intended to file suit with regards to the Hyman Digital dispute and (2) Mr. Purohit would demand that all Farmacy access and accounts be returned to him "given that he remains its sole Manager".

73.    Proving that he had no intention of settling, rather than continuing with the negotiations, on June 28, 2024, Mr. Purohit was informed that Dr. Hyman had fired his former counsel and replaced her with Karen Agnifilo of Perry Law.

74.    On the same day, counsel for Mr. Purohit again informed Dr. Hyman and his new representative that the deadline had not changed, stating that Mr. Purohit "hereby rescinds Mr. Hyman's right to manage any aspect of Farmacy and as Farmacy's manager hereby demands that Mr. Hyman immediately relinquish access and control to all of Farmacy's accounts.  Failure to do so shall constitute an ongoing violation of the Farmacy operating agreement."

75.    When the July 11, 2024 deadline passed with no settlement, Mr. Purohit instituted the HD Litigation.

76.    Meanwhile, after three formal requests to reinstated Mr. Purohit's access and control over Farmacy, Dr. Hyman finally responded on July 18, 2024, gaslighting Mr. Purohit by falsely claiming that access was never revoked.

77.    This is simply untrue.  To-date, Farmacy's bank accounts are still subject to supervision and veto by Dr. Hyman and his HD CFO.  When Mr. Purohit attempted to regain control of Farmacy's bank account, the bank (TD Ameritrade Bank) responded that it had received "conflicting requests" and would not make any changes absent joint instructions from both Dr. Hyman and Mr. Purohit.  Dr. Hyman refused to provide said joint instructions, insisting that Mr. Purohit's control over Farmacy's bank account remain limited and that Dr. Hyman direct control over the account.

78.    With TD Ameritrade Bank refusing to cooperate with Farmacy's manager as a

direct result of Dr. Hyman's interference, in August 2024, Farmacy opened a new bank account with JP Morgan Chase and began transferring funds from TD Ameritrade Bank to JP Morgan Chase.

79.    After several such transfers, Dr. Hyman continued his interference by convincing TD Ameritrade Bank to completely freeze Farmacy's ability to withdraw additional funds, once again freezing Farmacy out of its own bank account.

80.    Additionally, it took weeks for Dr. Hyman to transfer to Mr. Purohit the history of Farmacy's customer support inquiring, which was housed in an application called Help Scout. During this time, Farmacy was unable to view the history of its own customer's complaints and therefore could not address those complaints.

## VIII.    Harm Caused by Dr. Hyman's Actions

81.    Dr. Hyman effectively froze Mr. Purohit out of his own company, fired its primary employee, harmed Farmacy's finances, its reputation with vendors, its reputation with customers, decimated Farmacy's ability to reach its sales goals, and endorsed Farmacy's competitor and its products.

82.    As just one example, after firing Ms. Gross, Dr. and Mrs. Hyman did not send out a single communication or advertisement to Farmacy's email listserv and failed to reorder any additional product—which will once again leave Farmacy completely out of stock during the month of October 2024.

83.    As another example, while Farmacy was out of stock, Dr. and Mrs. Hyman failed to inform Farmacy's customers of the fact that Farmacy was out of stock and simultaneously failed to turn off the customers' ability to purchase Farmacy's products.  Instead, customers paid for products that did not exist and would not ship for over *month* when it was finally restocked. This further served to harm Farmacy's reputation and profitability and placed Farmacy at risk of being in violation of FTC regulations.

84.    A comparison of Farmacy's sales numbers is one clear indicator of the harm caused by Dr. Hyman.  During the first two quarters of 2023, Farmacy generated approximately $1,097,785 in sales.  During that same exact time period in 2024, Farmacy generated

1  approximately $739,230 in sales, a massive 33% decline.

2      85.    Another comparison is Farmacy's valuation in the eyes of the free market.  In July

3  2023, prior to Dr. Hyman's violations, an investment fund offered to invest in Farmacy at a $6

4  million valuation.  By comparison, and on information and belief, Farmacy is worth less than half

5  as much as of July 2024, diminishing its value by at least $4 million.

6      86.    In taking the above actions, Dr. Hyman has turned Farmacy from a profitable,

7  respectable, and sought-after company to a company that is barely functioning.  In its present

8  state, entirely due to Dr. Hyman's violations, Farmacy is incredibly unlikely to find new investors

9  or buyers.

10      87.    Having caused numerous issues, Dr. Hyman now seeks to wash his hands of

11  Farmacy by withdrawing from its membership.

12      88.    Even after announcing his withdrawal, Dr. Hyman continues to harm Farmacy by

13  (1) insisting that he maintain control and veto over Farmacy's bank account; (2) dragging his feet

14  on the transition of Farmacy's accounts from himself and his companies to Mr. Purohit; (3)

15  instructing his employees, who were previously partially assigned to work on Farmacy, not to

16  cooperate with Farmacy; (4) refusing to issue joint instructions to Farmacy's bank in order to

17  maintain Mr. Purohit's limited control over the account; (5) continuing to withdraw funds from

18  Farmacy in violation of the Farmacy operating agreement and in violation of Mr. Purohit's clear

19  instructions; (6) refusing to authorize Farmacy purchasing additional product to protect his own

20  interests over Farmacy's; and (7) ultimately preventing Farmacy from accessing its own funds.

21      89.    Even after Dr. Hyman officially withdraws from Farmacy, he remains liable for

22  the breaches he caused during his membership.

23                    **CAUSES OF ACTION**

24                    **FIRST CAUSE OF ACTION**

25      **Breach of Written Contract – Farmacy Operating Agreement**

26              **(By Both Claimants Against Dr. Hyman)**

27      90.    Claimants incorporate and allege by reference each and every allegation contained

28  in the preceding paragraphs.

91.    Mr. Purohit and Dr. Hyman entered into the Operating Agreement to form Farmacy on November 21, 2019.

92.    Under the Operating Agreement, the two agreed to be equal, 50% partners, with Mr. Purohit as Manager of Farmacy.

93.    The Operating Agreement further provides, in paragraph 14.1(c), that members must disclose and seek approval of any business or transaction involving the marketing, development, and sale of health supplements, other than Vitamin Portfolio LLC.  *See* Exh. A, Operating Agreement, at ¶ 14.1(c).

94.    Dr. Hyman's marketing, promotion, and announcement of his appointment to Seed's board is in breach of this agreement as his role promoting the sale and development of a product which directly competes with Farmacy's inventory.

95.    Furthermore, in Dr. Hyman's role on the Clinical Board of Seed, he described Seed's probiotic, DS-01, as a "game changer" and stated that he "recommend[s] and wholeheartedly endorse[s]" the probiotic.

96.    Dr. Hyman did not have the authority to join Seed's Clinical Board or market DS-01 as Dr. Hyman never informed Mr. Purohit of Dr. Hyman's offer to join to the board, nor sought approval to do so, and this this action breached paragraph 14.1(c) of the Operating Agreement. *See* Exh. A, Operating Agreement, at ¶ 14.1(c).

97.    The marketing of DS-01 also directly frustrates the efforts of Farmacy to promote and sell their competing products, in direct contradiction to Dr. Hyman's contractual responsibilities under the Operating Agreement.

98.    Dr. Hyman further breached the Operating Agreement by preventing Farmacy from paying its outside law firm and by withholding funds from Mr. Purohit while simultaneously taking funds for himself.

99.    Dr. Hyman's breaches caused considerable damage to Farmacy's reputation, valuation, and viability.  On information and belief, over the course of seven months, Dr. Hyman successfully diminished Farmacy's value from (at least) $6 million to (at most) half that amount.

100.    Dr. Hyman's enthusiastic and repeated endorsement of a competitor and its products has also made it nearly impossible for Farmacy to raise additional funds or to attract potential buyers.

101.    As a result of Dr. Hyman's breach, Claimants have sustained damages in an amount to be determined at the arbitration hearing, but no less than $4 million, plus costs interest.

102.    Claimants are further entitled to, and thus seek, a declaratory judgment, injunctive relief, and/or specific performance ordering Dr. Hyman to: (1) relinquish any control or oversight he possesses over Farmacy's bank account; (2) cease withdrawing funds from Farmacy's bank account; (3) cease any interference with Farmacy's operations, including but not limited to hiring and paying employees, vendors, or contractors, and ordering of inventory; (4) cease working with, marketing, or promoting Farmacy's competitors and their products, including Seed's DS-01; and (5) continue to promote Farmacy and its products while still a member of Farmacy.

<h3 style="text-align:center">SECOND CAUSE OF ACTION</h3>

<h3 style="text-align:center">Breach of Fiduciary Duty</h3>

<h3 style="text-align:center">(By Both Claimants Against Dr. Hyman)</h3>

103.    Claimants incorporate and allege by reference each and every allegation contained in the preceding paragraphs.

104.    Mr. Purohit and Dr. Hyman both control a 50% equity split in Farmacy pursuant to the Operating Agreement.

105.    Members and managers of a closely held LLC owe a duty of good faith and loyalty to the LLC and to other members.

106.    Members and managers further have a duty not to frustrate the reasonable expectations of other members, including taking steps to inhibit the company's ability to compete.

107.    Mr. Purohit has fulfilled all his obligations under the Operating Agreement.

108.    Mr. Purohit has acted in good faith towards Dr. Hyman.

109.    Dr. Hyman has failed to perform his required obligations in numerous ways, including but not limited to, failing to provide Mr. Purohit with equal possession, access, and control of Farmacy, promoting competing health supplements, and failing to properly manage

Farmacy's inventory and personnel during the Parties' settlement negotiations—after having affirmatively taken on the role.

110.    Dr. Hyman has breached his fiduciary duty to both Mr. Purohit and Farmacy by unilaterally, and without authority or factual basis:

      a)    removing Mr. Purohit's access to Farmacy, including bank and vendor accounts;

      b)    firing Ms. Gross without Mr. Purohit's prior knowledge or approval;

      c)    preventing Mr. Purohit from operating as the Manager of Farmacy (as outlined in the Operating Agreement);

      d)    failing to inform Mr. Purohit of critical decision making at Farmacy;

      e)    preventing Farmacy from paying its law firm;

      f)    preventing Farmacy from making distributions to Mr. Purohit, while simultaneously making distributions to himself;

      g)    joining Seed's advisory board;

      h)    promoting Seed's competitive health supplement, DS-01, without seeking to inform Mr. Purohit or seek approval;

      i)    preventing Farmacy from communicating with its own customers;

      j)    delaying inventory orders;

      k)    failing to keep inventory of Gut Food stable;

      l)    taking funds from Farmacy without authorization;

      m)    preventing Farmacy from accessing funds in its own bank account;

      n)    refusing to authorize Farmacy to reorder additional Gut Food;

      o)    failing to appoint a proper replacement for Ms. Gross; and

      p)    pursuing his own interests above those of Farmacy and Mr. Purohit.

111.    As at least one indication of the harm caused by Dr. Hyman's breaches, Farmacy's sales for the first two quarters of 2024 (under Dr. Hyman's control and during his breaches) decreased by approximately $350,000 (or 33%) as compared to Farmacy's sales during the first

two quarters of 2023 (under Mr. Purohit's management), from $1,097,785 in 2023 to $739,230 in 2024.

112.    Dr. Hyman's actions have also interrupted Farmacy's valuation process and created confusion with customers and loss of goodwill with its customers.

113.    Dr. Hyman's actions were purposeful with done the knowledge that they were wrong and unlawful, or at the very least, grossly negligent or reckless constituting intentional misconduct.

114.    Dr. Hyman's breaches caused considerable damage to Farmacy's reputation, valuation, and viability.  On information and belief, over the course of seven months, Dr. Hyman successfully diminished Farmacy's value from (at least) $6 million to (at most) half that amount.

115.    Dr. Hyman's enthusiastic and repeated endorsement of a competitor and its products has also made it nearly impossible for Farmacy to raise additional funds or to attract potential buyers.

116.    As a result of Dr. Hyman's breaches of his fiduciary duties, Claimants have sustained damages in an amount to be determined at the arbitration hearing, but no less than $4 million, plus costs and interest.

117.    Claimants are further entitled to, and thus seek, a declaratory judgment, injunctive relief, and/or specific performance ordering Dr. Hyman to: (1) relinquish any control or oversight he possesses over Farmacy's bank account; (2) cease withdrawing funds from Farmacy's bank account; (3) cease any interference with Farmacy's operations, including but not limited to hiring and paying employees, vendors, or contractors, and ordering of inventory; (4) cease working with, marketing, or promoting Farmacy's competitors and their products, including Seed's DS-01; and (5) continue to promote Farmacy and its products while still a member of Farmacy.

### THIRD CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (By Both Claimants Against Dr. Hyman)

118.    Claimants incorporate and allege by reference each and every allegation contained in the preceding paragraphs.

119. Every contract implies good faith and fair dealing between the parties.

120. The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

121. Dr. Hyman has breached the implied covenant by unilaterally, and without authority or factual basis:

   a)    removing Mr. Purohit's access to Farmacy, including bank and vendor accounts;

   b)    firing Ms. Gross without Mr. Purohit's prior knowledge or approval;

   c)    preventing Mr. Purohit from operating as the Manager of Farmacy (as outlined in the Operating Agreement);

   d)    failing to inform Mr. Purohit of critical decision making at Farmacy;

   e)    preventing Farmacy from paying its law firm;

   f)    preventing Farmacy from making distributions to Mr. Purohit, while simultaneously making distributions to himself;

   g)    joining Seed's advisory board;

   h)    promoting Seed's competitive health supplement, DS-01, without seeking to inform Mr. Purohit or seek approval;

   i)    preventing Farmacy from communicating with its own customers;

   j)    delaying inventory orders;

   k)    failing to keep inventory of Gut Food stable;

   l)    taking funds from Farmacy without authorization;

   m)    preventing Farmacy from accessing funds in its own bank account;

   n)    refusing to authorize Farmacy to reorder additional Gut Food;

   o)    failing to appoint a proper replacement for Ms. Gross; and

   p)    pursuing his own interests above those of Farmacy and Mr. Purohit.

122. As at least one indication of the harm caused by Dr. Hyman's breaches, Farmacy's sales for the first two quarters of 2024 (under Dr. Hyman's control and during his breaches)

decreased by approximately $350,000 (or 33%) as compared to Farmacy's sales during the first two quarters of 2023 (under Mr. Purohit's management), from $1,097,785 in 2023 to $739,230 in 2024.

123.    Dr. Hyman's actions have also interrupted Farmacy's valuation process and created confusion with customers and loss of goodwill with its customers.

124.    Dr. Hyman's actions were purposeful with done the knowledge that they were wrong and unlawful, or at the very least, grossly negligent or reckless constituting intentional misconduct.

125.    Dr. Hyman's breaches caused considerable damage to Farmacy's reputation, valuation, and viability.  On information and belief, over the course of seven months, Dr. Hyman successfully diminished Farmacy's value from (at least) $6 million to (at most) half that amount.

126.    Dr. Hyman's enthusiastic and repeated endorsement of a competitor and its products has also made it nearly impossible for Farmacy to raise additional funds or to attract potential buyers.

127.    As a result of Dr. Hyman's breach of the covenant of good faith and fair dealing, Claimants have sustained damages in an amount to be determined at the arbitration hearing, but no less than $4 million, plus costs and interest.

128.    Claimants are further entitled to, and thus seek, a declaratory judgment, injunctive relief, and/or specific performance ordering Dr. Hyman to: (1) relinquish any control or oversight he possesses over Farmacy's bank account; (2) cease withdrawing funds from Farmacy's bank account; (3) cease any interference with Farmacy's operations, including but not limited to hiring and paying employees, vendors, or contractors, and ordering of inventory; (4) cease working with, marketing, or promoting Farmacy's competitors and their products, including Seed's DS-01; and (5) continue to promote Farmacy and its products while still a member of Farmacy.

# FOURTH CAUSE OF ACTION

## Unjust Enrichment / Restitution

### (By Farmacy Against Dr. Hyman)

129.    Claimants incorporate and allege by reference each and every allegation contained in the preceding paragraphs.

130.    In the alternative to the breach of contract claims asserted above, and in the event that any contract between the parties is found to be unenforceable, or in the event the trier of fact finds that there were no contracts, Farmacy asserts a claim for relief for unjust enrichment.

131.    Mr. Purohit and Dr. Hyman entered into the Operating Agreement to form Farmacy on November 21, 2019.

132.    Under the Operating Agreement, the two agreed to be equal, 50% partners, including splitting all business revenues, costs, and expenses, with Mr. Purohit to act as Manager of Farmacy.

133.    The Operating Agreement further provides, in paragraph 14.1(c), that members must disclose and seek approval of any business or transaction involving the marketing, development, and sale of health supplements, other than Vitamin Portfolio LLC.  *See* Exh. A, Operating Agreement, at ¶ 14.1(c).

134.    Dr. Hyman's marking, promotion, and announcement of his appointment to Seed's board is in breach of this agreement as his role promoting the sale and development of a product which directly competes with Farmacy's inventory.

135.    Furthermore, in Dr. Hyman's role on the Clinical Board of Seed, he described Seed's probiotic, DS-01, as a "game changer" and stated that he "recommend[s] and wholeheartedly endorse[s]" the probiotic.

136.    Dr. Hyman did not have the authority to join Seed's Clinical Board or market DS-01 as Dr. Hyman never informed Mr. Purohit of Dr. Hyman's offer to join to the board, nor sought approval to do so.

137.    The marketing of DS-01 also directly frustrates the efforts of Farmacy to promote and sell their competing products, in direct contradiction to Dr. Hyman's responsibilities under the Operating Agreement.

138.    Dr. Hyman's retention of benefits conferred by Farmacy, including a 50% equitable share of profits, would be inequitable without payment for its value.

139.    Additionally, Dr. Hyman has taken funds from Farmacy's bank account and in violation of Farmacy's operating agreement.

140.    As a result of Dr. Hyman's breach, Dr. Hyman has been unjustly enriched to Farmacy's detriment.

141.    Dr. Hyman should be compelled to disgorge all unlawful or inequitable proceeds he received related to his partnership with Seed and promotion of DS-01 in a constructive trust as Farmacy is entitled to Dr. Hyman's ill-gotten gains resulting from his unlawful, unjust, and inequitable conduct.

142.    As such, Farmacy has sustained damages in an amount to be determined at the arbitration hearing, plus interest, and is entitled to a disgorgement of any and all benefits received by Dr. Hyman for the wrongful acts.

**FIFTH CAUSE OF ACTION**

**Conversion**

**(By Both Claimants Against Dr. Hyman)**

143.    Claimants incorporate and allege by reference each and every allegation contained in the preceding paragraphs.

144.    Dr. Hyman is a non-managing member of Farmacy who is not entitled to withdraw money from Farmacy's bank account.

145.    Between January 9, 2024 and July 9, 2024, Dr. Hyman withdrew a total of $93,800 from Farmacy.

146.    This was done without authorization from Mr. Purohit and without paying Mr. Purohit a commensurate amount.

147.    After the breakdown of the Parties' settlement negotiations and after Mr. Purohit reasserted his control over Farmacy, he explicitly instructed Dr. Hyman not to withdraw any additional funds from Farmacy's bank account.

148.    Despite this explicit instruction, on or around August 6, 2024, Dr. Hyman withdraw an additional $6,700 from Farmacy's bank account.

149.    At the same time, Dr. Hyman provided conflicting instructions to Farmacy's bank (TD Ameritrade Bank) in order to prevent Mr. Purohit from gaining full control over Farmacy's bank account.

150.    As a result of Dr. Hyman's actions, Farmacy and Mr. Purohit have sustained damages in an amount to be determined at the arbitration hearing, but no less than $6,700, plus interest.

151.    In committing these wrongful acts, Dr. Hyman acted intentionally, with malice and in conscious disregard of Farmacy's and Mr. Purohit's rights and resulting damages.  As a result, Farmacy and Mr. Purohit are entitled to an award of punitive and exemplary damages.

### SIXTH CAUSE OF ACTION

**Theft by False Pretenses (California Penal Code § 496)**

**(By Both Claimants Against Dr. Hyman)**

152.    Claimants incorporate and allege by reference each and every allegation contained in the preceding paragraphs.

153.    Dr. Hyman is a non-managing member of Farmacy who is not entitled to withdraw money from Farmacy's bank account.

154.    Between January 9, 2024 and July 9, 2024, Dr. Hyman withdrew a total of $93,800 from Farmacy.

155.    This was done without authorization from Mr. Purohit and without paying Mr. Purohit a commensurate amount.

156.    After the breakdown of the Parties' settlement negotiations and after Mr. Purohit reasserted his control over Farmacy, he explicitly instructed Dr. Hyman not to withdraw any additional funds from Farmacy's bank account.

157.    Despite this explicit instruction, on or around August 6, 2024, Dr. Hyman withdraw an additional $6,700 from Farmacy's bank account.

158.    At the same time, Dr. Hyman provided conflicting instructions to Farmacy's bank (TD Ameritrade Bank) in order to prevent Mr. Purohit from gaining full control over Farmacy's bank account.

159.    As a result of Dr. Hyman's actions, Farmacy and Mr. Purohit have sustained damages in an amount to be determined at the arbitration hearing, but no less than $6,700, plus interest.

160.    In committing these wrongful acts, Dr. Hyman acted intentionally and criminally. As a result, Farmacy and Mr. Purohit are entitled to statutory treble damages, plus costs and attorneys' fees.

## **PRAYER FOR RELIEF**

Claimants pray for judgment and relief against Dr. Hyman as follows:

1.    A temporary and permanent injunction requiring Dr. Hyman to provide Mr. Purohit primary and unrestricted access to Farmacy's bank and vendor accounts;

2.    A temporary and permanent injunctive relief, declaratory judgment, and/or specific performance ordering Dr. Hyman to: (1) relinquish any control or oversight he possesses over Farmacy's bank account; (2) cease withdrawing funds from Farmacy's bank account; (3) cease any interference with Farmacy's operations, including but not limited to hiring and paying employees, vendors, or contractors, and ordering of inventory; (4) cease working with, marketing, or promoting Farmacy's competitors and their products, including Seed's DS-01; and (5) continue to promote Farmacy and its products while still a member of Farmacy.

3.    Monetary damages paid to Farmacy in an amount to be determined at the Arbitration hearing, but no less than $4 million;

4.    Monetary damages paid to Mr. Purohit in an amount to be determined at the Arbitration hearing;

5.    An order disgorging all profits, benefits, or other compensation obtained by Dr. Hyman from his wrongful conduct and restitution of those profits to Farmacy;

6.      An order awarding Claimants costs of suit;

7.      Pre- and post-judgment interest, as required by contract or law, whichever is greater;

8.      Punitive Damages;

9.      Treble Damages;

10.     Attorneys' fees, as authorized by contract or statute, whichever is greater; and

11.     Such other relief as the Arbitrator may deem just and proper.

Dated:  August 15, 2024

ORSUS GATE LLP
Denis Shmidt
Nabil Bisharat
Jennifer Haidar

By:  _____
Denis Shmidt
*Attorneys for Claimants Dhrumil Purohit and Farmacy LLC*