# EXHIBIT F

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Settlement and Release Agreement (the "Agreement") is entered into by and between Dhru Purohit ("Dhru"), Harshal Purohit ("Harshal"), ~~and~~ Kaya Purohit ("Kaya"), and , and Farmacy LLC ("Farmacy"; together with Dhru, ~~and~~ Harshal, and Kaya, the "Purohits"), on the one hand, and Mark Hyman ("Mark"), Hyman Digital, LLC ("HD"), Hyman Enterprises, LLC, Hyman Integrative Therapies, LLC, Vitamin Portfolio, LLC~~, and Farmacy LLC~~ (collectively, the "Hymans"), on the other hand.  Individually, each is a "Party" and together they are the "Parties".

### RECITALS

WHEREAS, in 2015, Dhru and Mark formed HD;

WHEREAS, Mark is the 80% member and manager of HD;

WHEREAS, Dhru is the 20% member of HD;

WHEREAS, for the duration of his employment with HD, Dhru was employed as HD's CEO;

WHEREAS, Harshal and Kaya are also former employees of HD;

WHEREAS, in November 2019, Dhru and Mark created Farmacy;

WHEREAS, Dhru and Mark are 50/50 owners of Farmacy with Dhru acting as its manager;

WHEREAS, in late 2023, Dhru resigned as HD's CEO;

WHEREAS, under the HD Operating Agreement, upon his resignation as HD's CEO, HD was required to repurchase Dhru's membership interest in HD;

WHEREAS, several disputes arose between the Parties relating to the business of HD and Farmacy;

WHEREAS, on July 11, 2024, Dhru initiated a lawsuit in the U.S. District Court, District of Massachusetts against Mark individually and derivatively on behalf of HD, Case No. 1:24-cv-11784 (the "Massachusetts Claims");

WHEREAS, on July 23, 2024, Mark withdrew from Farmacy pursuant to its operating agreement;

WHEREAS, on August 2, 2024, HD initiated counterclaims in the same Massachusetts case against Dhru (the "Massachusetts Counterclaims"; together with the Massachusetts Claims, the "Massachusetts Litigation");

1

WHEREAS, on August 15, 2024, Dhru and Farmacy initiated an arbitration against Mark before JAMS, reference number

WHEREAS, the Parties desire to enter into a settlement to resolve the ownership of HD, Farmacy, and the companies' respective assets, and to globally settle any and all disputes they have against one another and their agents/affiliates.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the promises, covenants, and agreements contained herein, the adequacy of which are hereby acknowledged, the Parties agree as follows:

1. <u>Effective Date</u>.  The Agreement shall become effective upon execution of the Agreement by all Parties (the "Effective Date").

2. <u>HD Settlement ~~Amount~~</u>:  Within fifteen (15) days of the Effective Date, Mark and HD shall pay or cause to be paid to Dhru $2,421,052.00 (the "HD Settlement Amount").  Mark and HD agree to each be equally, jointly, and severally liable for the full HD Settlement Amount.  Transfer of Dhru's shares in HD shall be effectuated on the date upon which the $2,421,052.00 payment is received by Dhru and, upon receipt of this payment, Mark shall automatically become the effective owner of Dhru's entire Membership Interest in HD and Dhru's rights as an owner or member shall cease immediately on that date. ~~Mark shall pay or cause to be paid to Dhru a sum of $2,973,552, plus applicable interest (the "Settlement Amount") subject to the terms and conditions set forth herein and such payment shall constitute full consideration, compensation, severance, and fulfillment of any and all claims, obligations, attorneys' fees, costs, membership transfer requirements, and contributions the Hymans' has or may have had to him and his family members.~~  The Parties agree that this payment constitutes appropriate and valuable consideration for the terms, conditions, and obligations set forth herein as well as full consideration for the transfer of all shares Mr. Purohit has in HD ~~and Farmacy~~ to Mark or an assignee of Mark's designation.  The Hymans understand and agree that distribution of the HD Settlement Amount by and among the Purohits shall be solely at the discretion of the Purohits and the Purohits agree that fulfillment of the payment terms herein shall constitute due and valuable consideration to support the mutual releases and obligations herein as to all Released Parties (as that term is defined below).

3. <u>Farmacy Settlement</u>:  Immediately upon the Effective Date, Mark shall be entitled to all of the funds held in Farmacy's TD Bank account (Account No. 825-8580014) (the "TD Bank Account").  In exchange, Dhru shall automatically become the effective owner of Mark's entire Membership Interest in Farmacy and Mark's rights as an owner or member shall cease immediately on that date. The Parties agree that this payment constitutes appropriate and valuable consideration for the terms, conditions, and obligations set forth herein as well as full consideration for the transfer of all shares Mark has in Farmacy to Dhru or an assignee of Dhru's designation.  The Purohits understand and agree that distribution of the funds in the TD Bank Account by and among the Hymans shall be solely at the discretion of the Hymans and the Hymans agree that fulfillment of the payment terms herein shall constitute due and valuable

2

consideration to support the mutual releases and obligations herein as to all Released Parties (as that term is defined below). Within fifteen (15) days of the Effective Date, Mark shall transfer all of the funds out of the TD Bank Account and request that TD Bank close the TD Bank Account.

2.

   a. The Parties agree that Mark and HD shall pay or cause to be paid to Dhru $2,421,052.00 of the Settlement Amount on the following payment schedule. Mark and HD agree to each be equally, jointly, and severally liable for this portion of the Settlement Amount.

      i. Initial HD Payment. $605,263.00 shall be payable within thirty (30) days of the Effective Date (the "Initial HD Payment").

      ii. Remaining HD Payment. The remaining $1,815,789 shall bear interest at a rate of four percent (4%) per year and shall be paid out in installments on a quarterly basis over a three-year period using the following schedule:

         1. $167,960.48 shall be paid by no later than August 1, 2024;
         2. $166,447.33 shall be paid by no later than November 1, 2024;
         3. $164,934.17 shall be paid by no later than February 1, 2025;
         4. $163,421.01 shall be paid by no later than May 1, 2025;
         5. $161,907.85 shall be paid by no later than August 1, 2025;
         6. $160,394.70 shall be paid by no later than November 1, 2025;
         7. $158,881.54 shall be paid by no later than February 1, 2026;
         8. $157,368.38 shall be paid by no later than May 1, 2026;
         9. $155,855.22 shall be paid by no later than August 1, 2026;
         10. $154,342.07 shall be paid by no later than November 1, 2026;
         11. $152,828.91 shall be paid by no later than February 1, 2027;
         12. $151,315.75 shall be paid by no later than May 1, 2027.

         There shall be no penalty for early payment. Any early payment shall be subtracted from the next payment due under the above schedule. As an example, if Mark or HD make a payment to Dhru on August 1, 2024 in the amount of $200,0000, then they will only owe Dhru November 1, 2024 payment $134,407.81 ($166,447.33 minus the $32,039.52 overpayment).

         iii. Transfer of HD Shares: Transfer of Dhru's shares in HD shall follow his receipt of the Initial HD Payment. Subject to the terms of this Agreement and its attachments, upon Dhru's receipt of the Initial HD Payment Mark will become the effective owner of Dhru's entire Membership Interest in HD and Dhru's rights as an owner or member shall cease immediately on that date.

3

  b. ~~Farmacy Payment and Share Transfer. The Parties agree that Mark and Farmacy shall pay or cause to be paid to Dhru the sum total of $552,500 of the Settlement Amount within fifteen (15) days of the Effective Date. Mark and Farmacy agree to each be equally, jointly, and severally liable for this portion of the Settlement Amount. Transfer of shares in Farmacy shall be effectuated on the date upon which the $552,500 is received by Dhru. Upon payment of the $552,500, Mark shall automatically become the effective owner of Dhru's entire Membership Interest in Farmacy and Dhru's rights as an owner or member shall cease immediately on that date. For the avoidance of doubt, the Parties specifically agree that payment may be made, and the shares may automatically transfer at any time, at Mark's discretion, prior to the sixty (60) days deadline, without any penalty.~~

  c. ~~Method of Payment. All payments shall be made via wire transfer to an account of Dhru's choice, which will be provided in a separate document. The account may be updated at Dhru's sole discretion, with 15 days written notice to Mark.~~

  d. ~~Tax Consequences. Dhru understands and agrees that the sum being paid under Paragraph 2(a)-(b) above may be taxable to him. Dhru agrees to pay federal and state taxes, if any, which are required by law to be paid with respect to these payments.~~

  4. <u>Dismissal of the Massachusetts Litigation and Arbitration. Within 5 days of the Effective Date, Mark shall cause HD to dismiss the Massachusetts Counterclaims and Dhru shall dismiss the entire Arbitration. Both dismissals shall be with prejudice. Within 5 days of receiving the full Settlement Amount, Dhru shall dismiss the Massachusetts Claims, with prejudice.</u>

  ~~3.~~ <u>5.</u> Time is of the Essence. Time is of the essence in complying with the dates in this Agreement. If the Hymans fail to make all or any portion of the settlement payments set forth in Section 2 more than ~~fifteen~~ <u>five</u> (~~1~~5) days after the applicable due dates, for any reason other than material breach of the Agreement by Dhru or his agents, the Hymans will be in default of this Agreement, and Dhru shall be immediately entitled to pursue collection of the full $<u>2,421,052.00</u> ~~2,973,552~~ (less any payments made) and any other damages sustained as a result of the default. The Parties further agree that nothing in this section shall be construed to limit the Parties' recovery in the event of a breach of the Agreement.

  4. ~~Payment of Farmacy's Counsel and Vendors. The Parties agree that Farmacy shall be solely responsible for any and all payments due to Nesenoff & Miltenberg LLP and Stout Risius Ross, LLC for work done through March 22, 2024. The Parties further agree that Dhru shall be solely responsible for invoices from Vinson & Elkins LLP based on work they performed for Farmacy or for Dhru prior to the Effective Date. Nothing in this Agreement shall be construed to accept the validity of any invoices issued by Nesenoff & Miltenberg LLP, Stout Risius Ross, LLC, or Vinson & Elkins LLP and nothing in this Agreement shall prevent either party from contesting said invoices. Dhru shall have no other obligations to pay Farmacy's vendors, creditors, or any other of Farmacy's financial commitments or obligations. The Parties'~~

4

~~further agree that attorney-client privilege, work product, and other statutory and common law confidentiality protections for work done by Nesenoff & Miltenberg LLP, Stout Risius Ross, LLC, and Vinson & Elkins LLP shall be solely owned and held by Farmacy. Notwithstanding the foregoing, the Parties agree that work product including drafts, correspondence, memoranda, and documentary or electronic evidence created or obtained by Vinson & Elkins LLP in the course and scope of the engagement by Farmacy shall remain in the sole possession of Vinson & Elkins LLP and shall not be within the possession, custody, or control of either Dhru, Mark, or Farmacy.~~

~~5.~~6.   Assignment and Recognition of Ownership of Rights

   a. The Hymans hereby recognize Dhru's rights and ownership over the following and, to the extent necessary, agree to and hereby do assign, convey, and transfer to Dhru or his assignee of choice any and all rights and ownership interest the Hyman may have in:

      (i) the social media channels comprising the Instagram account "@dhrupurohit" and the YouTube account "@dhrupurohit";

      (ii) the intellectual property rights, including copyrights and trademarks, associated with the *Try This* Newsletter and email list, and *The Dhru Purohit* Podcast; nothing in this section shall prevent HD utilizing its own email lists, even if there exists an overlap between persons on the *Try This* email list and HD's email lists; and

      (iii) the social media channels comprising the Instagram account "@dhrupurohit, the YouTube account "@dhrupurohit and associated YouTube channel (www.youtube.com/@dhrupurohit), Dhru's Apple account (account associated with Dhru's name), Dhru's personal and business Facebook accounts (accounts associated with Dhru's name), Dhru's X or Twitter account (@dhrupurohit), Dhru's Spotify account (account associated with Dhru's name), Dhru's TikTok account (@Dhru.Purohit), and the A-Cast account for the Dhru Purohit podcast (associated with the following email address: dhru@hey.com).

      ~~(iii)~~ The Farmacy brand, trademarks, and other intellectual property that Mark created, authored, invented, or received, whether jointly or individually, in the course and scope of his membership in Farmacy except for any such rights conveyed in Section 6(b), below. This section shall only apply to trademarks, copyrighted material, inventions, and other intellectual property that were authored, created, or conceived and reduced to practice, in the scope of Mark's Membership and/or employment with Farmacy.

      (iv)

   b. The Parties hereby recognizes HD's rights and ownership to the following and, to the extent necessary, Dhru agrees to and hereby does assign, convey,

5

and transfer to Mark or his assignee of choice any and all rights and ownership interest Dhru may have in:

   i. The HD ~~and Farmacy~~ brand~~s~~, trademarks, and other intellectual property that Mr. Purohit created, authored, invented, or received, whether jointly or individually, in the course and scope of his employment by HD<ins>,</ins> ~~and Farmacy~~ except for any such rights conveyed in Section ~~5~~<ins>6</ins>(a) above. This section shall only apply to trademarks, copyrighted material, inventions, and other intellectual property that were authored, created, or conceived and reduced to practice, in the scope of Dhru's Membership and/or employment by HD ~~and/or Farmacy~~.

   ii. The Broken Brain podcast and related intellectual property.

   iii. All email distribution lists associated with Broken Brain or the Dhru Purohit Podcast that were created while Dhru was employed by HD<ins>, except for any such rights conveyed in Section 6(a) above.</ins>~~.~~

c. The Parties agree to effectuate all necessary communications, authorizations, releases, assignments, and to grant all access or authority necessary to effectuate a transfer of the above rights.

~~6.~~<ins>7.</ins>    License to *The Broken Brain* Podcast.  The Parties acknowledge and agree that *The Broken Brain* podcast is solely and entirely owned by HD.  However, HD hereby grants Dhru a world-wide, non-exclusive, license to *The Broken Brain* podcast episodes that were hosted by Dhru.  Dhru's use of *The Broken Brain* podcast shall be limited in the following two ways: (1) after the Effective Date, Dhru may not create any new derivative works from any previous *The Broken Brain* podcast episodes; and (2) Dhru may not directly advertise any previous *The Broken Brain* podcast episodes.  Dhru agrees that he shall not intentionally place advertisements or cause such advertisements to be placed (*e.g.*, by including ad breaks or markers in episodes subscribed to Automated and Dynamic Ads) on the *Broken Brain* episodes that are subject to this license and, further, that all *Broken Brain* episodes that Dhru hosts as part of his back catalog or otherwise shall be clearly identified as belonging solely to Hyman Digital and a link to Hyman Digital shall be included in the notice of attribution.  Nothing in this section shall prohibit Dhru from placing advertisements on, or otherwise generating ad revenue from, other episodes of Dhru's podcast that are not branded as *Broken Brain* episodes or from allowing advertisements to be placed on his channel as a whole so long as such advertisements are not placed on or within any *Broken Brain* podcast episodes.

   a. <u>No Liability For Third Party Infringement</u>.  This license shall not provide for any right of accounting to HD and Mark.  Dhru shall not be responsible if a *The Broken Brain* podcast episode is advertised by a third party (such as YouTube) or if it is incorrectly attributed to him by any third party without direct or indirect authorization by Dhru (*e.g.*, by the placement of ad markers or "opting in" to the placement of ads on a podcast episode).  For the sake of clarity, pursuant to this license, Dhru shall not be prohibited from directly advertising any previous episodes of *The Dhru Purohit* podcast, even if such

6

    episodes contained a reference to, discussion of, or clips from any *The Broken Brain* podcast episodes and any and all future income streams relating to the *Dhru Purohit* podcast including but not limited to direct advertising revenue shall belong solely to Dhru. Violation of the terms of this license shall constitute a material breach of this Agreement.

b. <u>YouTube Hosting Provision</u>. The Parties acknowledge that Dhru has a verified YouTube channel called "The Dhru Purohit Show" (username: @DhruPurohit) that hosts prior Broken Brain episodes hosted by Dhru and subject to the license agreement set forth herein. Dhru represents and warrants that he has not placed ad markers or opted into any dynamic or automatic ad placement program on the platform, but that he has opted into channel-wide, pre-roll advertisements. The Parties hereby agree that, as part of Dhru's license, he shall be afforded a grace period, commencing on the Effective Date and ending on December 31, ~~2024~~ 2025 (the "Grace Period"), to "opt-out" of YouTube advertising on Broken Brain episodes that are subject to this license agreement. The placement of advertisements on any Broken Brain episodes during the Grace Period shall not be considered a violation of the Dhru's license agreement or infringement of HD's intellectual property rights. Thereafter, Dhru shall turn off video monetization for each and every Broken Brain episode subject to the license agreement via the YouTube Platform. The placement of any advertisement from *Broken Brain* podcast episodes by Dhru, after the Grace Period, shall constitute a material breach of this Agreement. However, any advertisements placed on Broken Brain episodes beyond Dhru's control shall not constitute a breach. Examples of advertisements beyond Dhru's control include, but are not limited to, YouTube unilaterally placing advertisements on Broken Brain episodes without Dhru's consent or YouTube denying Dhru the ability to turn monetization off for specific episodes.

c. <u>Revocation</u>. The license shall be revocable only in the event of a material breach of this Agreement or infringement of HD or Farmacy intellectual property rights. By way of example but not limitation, this license shall be revocable by HD in the event that Dhru violates the terms of this license by affirmatively placing advertisements or causing advertisements to be placed within episodes of *Broken Brain*, including by directing YouTube to place ads on Broken Brain episodes subject to this license. In the event that the Hymans believe that a breach has occurred sufficient to justify revocation of the license under this Agreement, the Hymans shall provide written notice by sending an email Dhru at dhru@hey.com and counsel for Purohits, Denis Shmidt at dshmidt@orsusgate.com and Nabil Bisharat at nbisharat@orsusgate.com (the "Notice"). The Purohits shall then have five (5) business days following the date of Notice to cure (the "Cure Period"). The Hymans may not revoke *The Broken Brain* license if the alleged default is cured within the Cure Period. However, the Parties agree that (1) failure to cure the identified violation on a timely basis during the notice period shall constitute willful infringement if a

7

violation of the license is found and (2) any lawsuit filed by Dhru during the notice period shall not be afforded deference under the "first to file" doctrine.

7.8.    IRS Schedule K-1 (Form 1065).  Within seven (7) days of the Effective Date, HD shall issue to Dhru an IRS Schedule K-1, Form 1065 (the "K-1") for 2023 indicating that Dhru's membership interest in HD terminated effective September 12, 2023.  Within seven (7) days of making the Payment set forth in Section 2(b), Farmacy shall issue to Dhru a K-1 for 2023 indicating that Dhru's membership interest in Farmacy terminated on March 1, 2024.

   a. Indemnification:  While the Parties dispute the end date of Mr. Purohit's employment and membership with HD, for the purposes of this provision only, HD agrees to accede to Dhru's request to identify the termination date of Dhru's membership in HD as September 12, 2023 on his K-1.  Dhru understands that by so agreeing, HD is not making any representations or guarantees about the tax implications of this provision and further that Dhru agrees to indemnify and defend HD to the extent of any tax liens, investigations, audits, or liability relating to or arising from HD's agreement to identify September 12, 2023 as the end date of Dhru's membership interest in his K-1.

8.9.    Mutual Release.  Upon Dhru's receipt of the full Settlement Payment, and except for the obligations set forth under this Agreement, and in consideration of the promises, covenants, and agreements contained herein, the Purohits on the one hand, and the Hymans, on the other hand, on behalf of themselves and each of their respective employees, directors, officers, members, representatives, shareholders, insurers, divisions, subsidiaries, predecessors, successors, assigns, (the "Releasing Parties"), mutually agree to unconditionally, irrevocably and forever release and discharge each other, as well as each of other's current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, benefit plans, plan administrators, insurers, trustees, heirs, estate, divisions, and subsidiaries, and predecessor and successor corporations and assigns (collectively, the "Releasees"), and agree not to sue concerning, or in any manner to institute, prosecute, or pursue, any claim, complaint, charge, duty, obligation, demand, or cause of action against one another up until and including the Effective Date of this Agreement.  This release is intended to be read as broadly as possible.  Pursuant to this release, ~~the Purohits~~ the Releasing Parties agree that they shall not pursue or further pursue any claim, dispute, controversy, cause of action, lawsuit, arbitration, damages, penalties, fees (attorneys' fees or otherwise), or costs arising out of, relating to, or in connection with: (a) the matters encompassed in this agreement; (b) the matters encompassed in the Massachusetts Litigation and the Arbitration (including matters that could have been brought in the Massachusetts Litigation or Arbitration); (~~b~~c) any ownership right, title, or interest and/or any other equity right, title, or interest arising out of and/or relating to HD and/or Farmacy; and/or (~~c~~d) each of the Purohits' respective employments and/or engagements with ~~each of~~ HD ~~and/or Farmacy~~, as applicable, including without limitation any compensation, benefits, or other remuneration in connection therewith; (e) each of the Hymans' respective employments and/or engagements with Farmacy, as applicable, including without limitation any compensation, benefits, or other remuneration in connection therewith; and/or (f) any claims they may have against one another.

8

The scope of the Purohits' releases in this Agreement includes but are not limited to a full and general release of any and all claims or potential claims as they may have against the Hymans and/or any other Released Parties for: (i.) any and all claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967 (ADEA), the Family and Medical Leave Act (FMLA), the Employee Retirement Income Security Act (ERISA), the National Labor Relations Act (NLRA), the Pregnancy Discrimination Act, the Worker Adjustment and Retraining Notification Act, the Americans with Disabilities Act (ADA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), any amendments to such laws, any other federal, state, or local constitution, charter, law, rule, ordinance, regulation, or order; (ii) claims based on veterans status; (iii) claims in equity or under common law including but not limited to claims for tort, breach of contract (express or implied, written or oral), wrongful discharge, defamation, emotional distress, and negligence; (iv) any and all claims arising under the California Labor Code, the California Government Code, or the California Business & Professions Code; (v) any and all claims arising under common law for intentional or negligent infliction of emotional distress, fraud, misrepresentation, defamation, interference with contract or other interests, or any other claims or causes of action for damages or monetary obligations of any nature, including without limitation, actual, compensatory, punitive, and liquidated damages, penalties, and attorneys' fees, costs and expenses; and (vi) any claims for injunctive relief or declaratory relief.

The foregoing notwithstanding, nothing contained herein shall constitute a release of any rights or claims that cannot be waived as a matter of law, including, without limitation, any rights or entitlements under California or other law for workers' compensation indemnity benefits under California's Workers' Compensation Act, or for unemployment or State Disability Insurance ("SDI") benefits under the California Unemployment Insurance Code.

9.10. <u>Release of Unknown Claims</u>.  It is further understood and agreed by the Releasing Parties to this Release that all rights under section 1542 of the California Civil Code, and any similar law of any state or territory of the United States, ARE HEREBY EXPRESSLY WAIVED.  Said section reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Releasing Parties hereby acknowledge that they have had the opportunity to consult with legal counsel before agreeing to the terms of this Release, and that they fully understand its meaning, including the meaning and effect including the provisions relating to section 1542 of the California Civil Code.

10.11. <u>Representations & Warranties by Dhru</u>:  The Purohits represent, warrant and acknowledged that the Hymans relied on the following representations by the Purohits when entering into this agreement:

    a. Other than the Settlement Amount due and payable hereunder, the Purohits have received all compensation due to them as a result of services performed for the Hymans.

    b. The Purohits have reported to the Hymans any and all work-related injuries or occupational illnesses incurred by them during their employment with the Company, if any.

    c. The Purohits were provided with any leaves of absence or other accommodations for their injuries, health conditions, or other covered conduct, and the Purohits were not subject to any improper treatment, conduct, or actions due to any request for or taking of such leave.

    d. The Purohits have been afforded a reasonable opportunity to provide HD/Farmacy with written notice of any and all concerns regarding known or suspected ethical or compliance issues or other legal violations on the part of HD, Farmacy, its officers, members, employees or agents.

    e. <ins>Aside from the Massachusetts Claims and the Arbitration,</ins> <del>The</del> the Purohits have not filed any other pending complaints, claims, lawsuits, or actions against the Hymans, or the Hymans' officers, board of directors, agents, supervisors, employees, attorneys or representatives, insurers or related or affiliated companies or entities with any state, federal or local agency, court or other authority; nor have the Purohits actively participated in an action brought by any third party against the Hymans.

    f. Upon full execution of this Agreement, the Purohits and their counsel will no longer be preparing, contemplating, or cooperating in the pursuit or preparation of any other claims or litigation against the Hymans.

    g. The undersigned has the full legal capacity, right, power, and authority to enter into this Agreement and has obtained all necessary consultations, consents, and approvals necessary to make the representations, warranties, and agreements herein.

<ins>  12. Representations & Warranties by Mark:  The Hymans represent, warrant and acknowledged that the Purohits relied on the following representations by the Hymans when entering into this agreement:</ins>

<ins>    a. Other than the amounts payable under this agreement, the Hymans have received all compensation due to them as a result of services performed for the Purohits.</ins>

<ins>    b. The Hymans have reported to the Purohits any and all work-related injuries or occupational illnesses incurred by them during their employment with Farmacy, if any.</ins>

<ins>    c. The Hymans were provided with any leaves of absence or other accommodations for their injuries, health conditions, or other covered conduct, and the Hymans were not subject to any improper treatment, conduct, or actions due to any request for or taking of such leave.</ins>

<ins>    d. The Hymans have been afforded a reasonable opportunity to provide Farmacy with written notice of any and all concerns regarding known or suspected ethical or compliance issues or other legal violations on the part of Farmacy, its officers, members, employees or agents.</ins>

10

e. Aside from the Massachusetts Counterclaims, the Hymans have not filed any other pending complaints, claims, lawsuits, or actions against the Purohits, or the Purohits' officers, board of directors, agents, supervisors, employees, attorneys or representatives, insurers or related or affiliated companies or entities with any state, federal or local agency, court or other authority; nor have the Hymans actively participated in an action brought by any third party against the Purohits.

f. Upon full execution of this Agreement, the Hymans and their counsel will no longer be preparing, contemplating, or cooperating in the pursuit or preparation of any other claims or litigation against the Purohits .

g. The undersigned has the full legal capacity, right, power, and authority to enter into this Agreement and has obtained all necessary consultations, consents, and approvals necessary to make the representations, warranties, and agreements herein.

11.13. Costs and Attorneys' Fees. Each Party shall bear its own costs and fees, including any attorneys' fees or expert fees, accumulated up to the Effective Date. However, in the event of a dispute under this Agreement, the prevailing party shall be entitled to recover all reasonable costs, including attorneys' fees.

12.14. Confidentiality. Beginning on the Effective Date and for a period of three (3) years, The the Parties agree to maintain in complete confidence the existence of this Agreement, the contents and terms of this Agreement, and the consideration for this Agreement (hereinafter collectively referred to as "Settlement Information"). Except as required by law or to enforce this Agreement, the Parties may disclose Settlement Information only to their immediate family members, their attorney(s), and their accountant and any professionals or tax advisor to the extent that they need to know the Settlement Information in order to provide advice on tax treatment or to prepare tax returns. The Parties agree that they will not publicize, directly or indirectly, any Settlement Information. Nothing in this paragraph shall be construed to prohibit a Party from discussing or disseminating this Agreement among the Releasees, so long as reasonable steps are taken to ensure the Agreement's confidentiality. The Parties agree that they shall limit any public response to questions regarding their dispute or this Agreement to affirming that "the Parties' dispute has been resolved" without further context or disclosure.

13. Mutual Non-Disparagement. Beginning on the Effective Date and for a period of three (3) years, the Parties agree to refrain from any disparagement, defamation, libel, or slander of any of the other Parties. The Parties further agree that monetary damages alone for any violation under this section are insufficient and that, in addition to monetary damages or any other legal recourse, immediate injunctive relief is appropriate to prevent further harm. Due to the difficulty of assessing damages for a breach under this section, the Parties agree that liquidated damages of $10,000 per instance of breach are a reasonable measure of damages and may be used in lieu of proving actual damages. The Parties agree that this liquidated damages provision is not a penalty but is a realistic attempt by the Parties to calculate the damages stemming from such a breach. The Parties further agree that neither Party is precluded from seeking actual damages for breach of this provision. Notwithstanding the above, the Parties acknowledge that the Massachusetts Litigation is publicly available and neither Party shall be held responsible if the Massachusetts Litigation is reported on, disseminated, or otherwise commented on by any third party.

11

15.

14.16.  No Admission of Liability.  The Parties understand and acknowledge that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims related to the Representation Agreement.  No action taken, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission of any fault or liability whatsoever to one another or to any other party.

15.17.  Right to Engage in Protected Activity.  Nothing in this Agreement (a) prevents any individual from discussing or disclosing information about unlawful acts in the workplace to appropriate authorities or as necessary to protect your rights or fulfill your legal obligations; (b) limits or affects any individuals' right to challenge the validity of this Release under the ADEA or the OWBPA; (c) prevents the Parties from communicating with, filing a charge or complaint with, providing documents or information voluntarily or in response to a subpoena or other information request to, or from participating in an investigation or proceeding conducted by, the Equal Employment Opportunity Commission, National Labor Relations Board, the Securities and Exchange Commission, law enforcement, or any other any federal, state or local agency charged with the enforcement of any laws; or from testifying, providing evidence, or responding to a subpoena or discovery request in court litigation or arbitration; (d) prevents a non-management, non-supervisory employee from engaging in protected activity under section 7 of the NLRA or similar state law such as joining, assisting, or forming a union, bargaining, picketing, striking, or participating in other activity for mutual aid or protection, or refusing to do so; this includes using or disclosing information acquired through lawful means regarding wages, hours, benefits, or other terms and conditions of employment, except where the information was entrusted to the employee in confidence as part of the employee's job duties. However, by signing this Release, the Released Parties understand and agree that they are waiving any right to recover any individual relief (including any backpay, frontpay, reinstatement or other legal or equitable relief) in any charge, complaint, or lawsuit or other proceeding brought by the Purohits or on behalf by any third party, except for any right the Purohits may have to receive a payment or award from a government agency for information provided to the government agency or where otherwise prohibited.

16.18.  Tolling. All periods of limitation (statutory or otherwise) affecting any claim or causes of action that any of the Parties may have against one another shall be tolled from the Effective Date through either (1) the end of May 1, 2027, or (2) the mutual performance of all obligations set forth herein including but not limited to payment of the Settlement Amount; whichever comes first.  The Parties agree and covenant not to sue for any of the claims set forth in Section 8 (Mutual Release) absent material breach and revocation of this Agreement.

17.19.  Reasonable Cooperation/Additional Documents.  The Parties agree to cooperate fully and execute any and all supplementary documents and take any additional action that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

~~18.~~20.  Independent Advice Of Counsel.  The Parties acknowledge that they have been represented by legal counsel and have freely assented to this Agreement, which has not involved coercion, undue influence or economic pressure or duress.

~~19.~~21.  Validity.  This Agreement shall be construed as though both Parties have participated equally in its drafting, and it shall be interpreted, wherever possible, to make it valid and effective. If any portion of this Agreement is deemed by a court or other authority of competent jurisdiction to be invalid, prohibited, illegal, unenforceable, or void, only that portion should be affected, and the rest of the Agreement shall be enforced as written here.  The headings used in this Agreement are for organizational purposes only and shall not be interpreted or construed as material terms of the Agreement.

~~20.~~22.  Authority. Each signatory represents and warrants that it has the right, power, legal capacity and authority to enter into, and perform, all respective obligations under this Agreement. To that end, each party and signatory to this Agreement agrees to indemnify, pay for, and hold the other harmless from any liability, claim, demand, damage, expense and attorneys' fees incurred by the other as a result of any assertion that the individual who executed this Agreement was not authorized to do so.

~~21.~~23.  Successors, Assigns and Beneficiaries.  This Agreement, and all of its terms, shall inure to the benefit of, and shall be binding upon, the successors, assigns, executors, representatives, beneficiaries and attorneys of the Parties.

~~22.~~24.  Amendments, Modifications, Waivers.  This Agreement may not be modified or amended, and no provision or benefit hereof may be waived, except in a written document executed by the Parties.

~~23.~~25.  No Representations.  Each Party represents that it has had an opportunity to consult with an attorney and has carefully read and understands the scope and effect of the provisions of this Agreement.  Each Party represents that it has not relied on any representations or statements made by any other Party that are not specifically set forth in this Agreement.

~~24.~~26.  Governing Law and Jurisdiction.  This Agreement shall be governed by the laws of the State of Massachusetts, without regard for any choice-of-law provisions.  The Parties consent to personal and exclusive jurisdiction and venue in the State of California, County of Los Angeles.

~~25.~~27.  Integration.  This Agreement constitutes the sole agreement and understanding of the Parties hereto concerning the subject matter hereof and supersedes all prior oral and written agreements relating to resolution of the matters set forth herein, including any agreements between Dhru and HD related to *The Dhru Purohit* Podcast and *Try This* Newsletter.  The Parties further agree that the Employment Services Agreement between Dhru and HD has been terminated and has been fully satisfied without any further obligation owed by either one to the other and that the Purohits are no longer bound by any non-compete or non-solicitation agreements with any of the Hymans (including with HD, Hyman Enterprises, LLC, Hyman Integrative Therapies, LLC, Vitamin Portfolio, LLC, and Farmacy LLC).  However, nothing in this agreement shall abrogate or undermine the post-employment / post-withdrawal

13

confidentiality obligations of any party hereto as set forth in the Hyman Digital Operating Agreement Section 15.3 and the July 1, 2015 Executive Services Agreement Sections 5.  For the avoidance of doubt, the Parties agree that the Purohits shall be released from any and all post-employment restrictive covenants prohibiting competition or solicitation that would violate California Business & Professions Code § 16600 and shall only be bound to the HD Operating Agreement Section 15.3 and/or the Executive Services Agreement Section 5 insofar as necessary to foreclose disclosure, misuse, dissemination, or misappropriation of HD trade secrets and other intellectual property assigned or acquired by Dhru in the course and scope of his employment/ membership in HD ~~and/or Farmacy~~.  The Parties agree that this Agreement constitutes full satisfaction of HD's notice obligations and shall be construed in accordance with California Business & Professions Code § 16600.1.  For the avoidance of doubt, Dhru is and has been effectively notified that any non-compete agreement between Dhru and HD is void.

~~26.~~28.  **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement may be executed electronically, and each electronic signature shall be deemed to be an original.

**DHRU PUROHIT**

By: _____

Printed: Dhru Purohit
Title:  Individual

Date: _____

**MARK HYMAN**

By: _____

Printed:  Mark Hyman
Title:  Individual

Date: _____

**HARSHAL PUROHIT**

By: _____

Printed: Harshal Purohit
Title:  Individual

Date: _____

**HYMAN DIGITAL, LLC**

By: _____

Printed:  Mark Hyman
Title:  Managing Member

Date: _____

14

| | |
|---|---|
| **KAYA PUROHIT** | **FARMACY LLC** |
| By: _____ | By: _____ |
| Printed: Kaya Purohit<br>Title: Individual | Printed: ~~Mark Hyman~~Dhru Purohit<br>Title: Member |
| Date: _____ | Date: _____ |
| | |
| **HYMAN INTEGRATIVE THERAPIES, LLC** | **HYMAN ENTERPRISES, LLC** |
| By: _____ | By: _____ |
| Printed: Mark Hyman<br>Title: Member | Printed: Mark Hyman<br>Title: Member |
| Date: _____ | Date: _____ |
| | |
| **VITAMIN PORTFOLIO, LLC** | **FARMACY LLC** |
| By: _____ | By: _____ |
| Printed: Mark Hyman<br>Title: Member | Printed: Mark Hyman<br>Title: Member |
| Date: _____ | Date: _____ |

15